# NEW YORK *v.* BURGER

No. 86–80.   Argued February 23, 1987—Decided June 19, 1987

692

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, STEVENS, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, and in all but Part III of which O'CONNOR, J., joined, *post*, p. 718.

*Elizabeth Holtzman* argued the cause for petitioner. With her on the briefs were *Barbara D. Underwood* and *Leonard Joblove*.

*Stephen R. Mahler* argued the cause for respondent. With him on the brief was *Perry S. Reich.**

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether the warrantless search of an automobile junkyard, conducted pursuant to a statute authorizing such a search, falls within the exception to the warrant requirement for administrative inspections of pervasively regulated industries. The case also presents the question whether an otherwise proper administrative inspection is unconstitutional because the ultimate purpose of the regulatory statute pursuant to which the search is done—the deterrence of criminal behavior—is the same as that of penal laws, with the result that the inspection may disclose violations not only of the regulatory statute but also of the penal statutes.

## I

Respondent Joseph Burger is the owner of a junkyard in Brooklyn, N. Y. His business consists, in part, of the dismantling of automobiles and the selling of their parts. His junkyard is an open lot with no buildings. A high metal fence surrounds it, wherein are located, among other things, vehicles and parts of vehicles. At approximately noon on November 17, 1982, Officer Joseph Vega and four other plainclothes officers, all members of the Auto Crimes Division of the New York City Police Department, entered re-

---

*\*Richard Emery, Gerard E. Lynch,* and *Alvin J. Bronstein* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

spondent's junkyard to conduct an inspection pursuant to N. Y. Veh. & Traf. Law § 415–a5 (McKinney 1986).[1] Tr. 6. On any given day, the Division conducts from 5 to 10 inspections of vehicle dismantlers, automobile junkyards, and related businesses.[2] *Id.*, at 26.

Upon entering the junkyard, the officers asked to see Burger's license[3] and his "police book"—the record of the auto-

---

[1] This statute reads in pertinent part:

"Records and identification.  (a) Any records required by this section shall apply only to vehicles or parts of vehicles for which a certificate of title has been issued by the commissioner [of the Department of Motor Vehicles] or which would be eligible to have such a certificate of title issued. Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers, and major component parts thereof, coming into his possession together with a record of the disposition of any such motor vehicle, trailer or part thereof and shall maintain proof of ownership for any motor vehicle, trailer or major component part thereof while in his possession.  Such records shall be maintained in a manner and form prescribed by the commissioner.  The commissioner may, by regulation, exempt vehicles or major component parts of vehicles from all or a portion of the record keeping requirements based upon the age of the vehicle if he deems that such record keeping requirements would serve no substantial value.  Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises. . . . The failure to produce such records or to permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor."

[2] It was unclear from the record why, on that particular day, Burger's junkyard was selected for inspection.  Tr. 23–24.  The junkyards designated for inspection apparently were selected from a list of such businesses compiled by New York City police detectives.  *Id.*, at 24.

[3] An individual operating a vehicle-dismantling business in New York is required to have a license:

"Definition and registration of vehicle dismantlers.  A vehicle dismantler is any person who is engaged in the business of acquiring motor vehicles or trailers for the purpose of dismantling the same for parts or reselling such vehicles as scrap.  No person shall engage in the business of or

mobiles and vehicle parts in his possession. Burger replied that he had neither a license nor a police book.[4] The officers then announced their intention to conduct a § 415–a5 inspection. Burger did not object. Tr. 6, 47. In accordance with their practice, the officers copied down the Vehicle Identification Numbers (VINs) of several vehicles and parts of vehicles that were in the junkyard. *Id.*, at 7, 20, 44, 46. After checking these numbers against a police computer, the officers determined that respondent was in possession of stolen vehicles and parts.[5] Accordingly, Burger was arrested and charged with five counts of possession of stolen property[6]

---

operate as a vehicle dismantler unless there shall have been issued to him a registration in accordance with the provisions of this section. A violation of this subdivision shall be a class E felony." N. Y. Veh. & Traf. Law § 415–a1 (McKinney 1986).

[4] There appears to have been some initial confusion among the inspecting officers as to whether Burger had not compiled a police book or whether, at the moment of the inspection, it simply was not in his possession. See Tr. 6, 30, 46–47, 59–60.

[5] The officers also determined that Burger possessed a wheelchair and a handicapped person's walker that had been located in a stolen vehicle. See *id.*, at 8–11, 13, 34–36.

[6] Respondent was charged with two counts of criminal possession of stolen property in the second degree in violation of a New York statute that, at that time, read:

"A person is guilty of criminal possession of stolen property in the second degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof, and when:

"1. The value of the property exceeds two hundred fifty dollars; or

.          .          .          .          .

"3. He is a pawnbroker or is in the business of buying, selling or otherwise dealing in property . . . .

.          .          .          .          .

"Criminal possession of stolen property in the second degree is a class E felony." N. Y. Penal Law § 165.45 (McKinney 1975).

Burger also was charged with three counts of criminal possession of stolen property in the third degree pursuant to the following provision of a New York statute:

and one count of unregistered operation as a vehicle dismantler, in violation of § 415–a1.

In the Kings County Supreme Court, Burger moved to suppress the evidence obtained as a result of the inspection, primarily on the ground that § 415–a5 was unconstitutional. After a hearing, the court denied the motion. It reasoned that the junkyard business was a "pervasively regulated" industry in which warrantless administrative inspections were appropriate, that the statute was properly limited in "time, place and scope," and that, once the officers had reasonable cause to believe that certain vehicles and parts were stolen, they could arrest Burger and seize the property without a warrant. App. to Pet. for Cert. 18a–19a. When respondent moved for reconsideration in light of a recent decision of the Appellate Division, *People* v. *Pace*, 101 App. Div. 2d 336, 475 N. Y. S. 2d 443 (1984), aff'd, 65 N. Y. 2d 684, 481 N. E. 2d 250 (1985),[7] the court granted reargument. Upon re-

---

"A person is guilty of criminal possession of stolen property in the third degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof.

"Criminal possession of stolen property in the third degree is a class A misdemeanor." N. Y. Penal Law § 165.40 (McKinney 1975).

[7] In *People* v. *Pace*, the Appellate Division was faced with a situation in which officers had conducted a warrantless search of an automobile salvage yard immediately after having their suspicions aroused about criminal activity there. The court did not find the exception for warrantless administrative inspections applicable in that situation, 101 App. Div. 2d, at 340, 475 N. Y. S. 2d, at 446, but made the following footnote remark:

"Subdivision 5 of section 415–a of the Vehicle and Traffic Law, the statute under which the police officers said they were acting, has no application. While this section requires dismantlers to keep a police book, the book was missing when the officers entered and it would thus have been impossible for the officers to exercise the alleged implied authority to compare the book entries to the contents of the yard." *Id.*, at 339, n. 1, 475 N. Y. S. 2d, at 445, n. 1.

Respondent construed this footnote to mean that police officers had to obtain a search warrant if a vehicle dismantler did not produce a police book

consideration, the court distinguished the situation in *Pace* from that in the instant case. It observed that the Appellate Division in *Pace* did not apply § 415–a5 to the search in question, 125 Misc. 2d 709, 711, 479 N. Y. S. 2d 936, 938 (1984), and that, in any event, the police officers in that case were not conducting an administrative inspection, but were acting on the basis of recently discovered evidence that criminal activity was taking place at the automobile salvage yard. *Id.*, at 712–714, 479 N. Y. S. 2d, at 939–940. The court therefore reaffirmed its earlier determination in the instant case that § 415–a5 was constitutional.[8] For the same reasons, the Appellate Division affirmed. 112 App. Div. 2d 1046, 493 N. Y. S. 2d 34 (1985).

The New York Court of Appeals, however, reversed. 67 N. Y. 2d 338, 493 N. E. 2d 926 (1986). In its view, § 415–a5 violated the Fourth Amendment's prohibition of unreasonable searches and seizures.[9] According to the Court of Ap-

---

and thus they could not conduct a warrantless inspection in the absence of this book. See 125 Misc. 2d 709, 711, 479 N. Y. S. 2d 936, 938 (Sup. 1984).

[8] In addition, the court determined that the search was proper under New York City Charter and Admin. Code § 436 (Supp. 1985). 125 Misc. 2d, at 712–715, 479 N. Y. S. 2d, at 939–940. That section reads:

"The commissioner [of the Police Department] shall possess powers of general supervision and inspection over all licensed and unlicensed pawnbrokers, vendors, junkshop keepers, junk boatmen, cartmen, dealers in second-hand merchandise and auctioneers within the city; and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession. A refusal or neglect to comply in any respect with the provisions of this section on the part of any pawnbroker, vendor, junkshop keeper, junk boatman, cartman, dealer in second-hand merchandise or auctioneer, or any clerk or employee of any thereof shall be triable by a judge of the criminal court and punishable by not more than thirty days' imprisonment, or by a fine of not more than fifty dollars, or both."

[9] The Court of Appeals found that the question of the constitutionality of the statute and charter was squarely presented by this case, as it had not been in *People* v. *Pace*, because there was no dispute that the inspection was made pursuant to those provisions. 67 N. Y. 2d, at 342–343, 493 N. E. 2d, at 928.

peals, "[t]he fundamental defect [of § 415–a5] . . . is that [it] authorize[s] searches undertaken solely to uncover evidence of criminality and not to enforce a comprehensive regulatory scheme. The asserted 'administrative schem[e]' here [is], in reality, designed simply to give the police an expedient means of enforcing penal sanctions for possession of stolen property." *Id.*, at 344, 493 N. E. 2d, at 929. In contrast to the statutes authorizing warrantless inspections whose constitutionality this Court has upheld, § 415–a5, it was said, "do[es] little more than authorize general searches, including those conducted by the police, of certain commercial premises." *Ibid.* To be sure, with its license and recordkeeping requirements, and with its authorization for inspections of records, § 415–a appears to be administrative in character. "It fails to satisfy the constitutional requirements for a valid, comprehensive regulatory scheme, however, inasmuch as it permits searches, such as conducted here, of vehicles and vehicle parts notwithstanding the absence of any records against which the findings of such a search could be compared." *Id.*, at 344–345, 493 N. E. 2d, at 929–930. Accordingly, the only purpose of such searches is to determine whether a junkyard owner is storing stolen property on business premises.[10]

Because of the important state interest in administrative schemes designed to regulate the vehicle-dismantling or automobile-junkyard industry,[11] we granted certiorari. 479 U. S. 812 (1986).

---

[10] For similar reasons, the Court of Appeals concluded that Charter § 436 also violated the Fourth Amendment's prohibition on unreasonable searches and seizures. 67 N. Y. 2d, at 344–345, 493 N. E. 2d, at 929–930.

[11] Numerous States have provisions for the warrantless inspections of vehicle dismantlers and automobile junkyards. See, *e. g.*, Ala. Code § 40–12–419 (1985); Ariz. Rev. Stat. Ann. § 28–1307C (Supp. 1986); Ark. Stat. Ann. § 75–1803 (1979); Cal. Veh. Code Ann. §§ 2805(a) and (c) (West Supp. 1987); Conn. Gen. Stat. § 14–67m(a) (Supp. 1987); Del. Code Ann., Tit. 21, § 6717(a) (1985); Fla. Stat. § 812.055 (Supp. 1987); Ga. Code Ann. § 43–48–16 (1984); Ill. Rev. Stat., ch. 95½, ¶ 5–403 (Supp. 1986); Ind.

II

A

The Court long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. *See* v. *City of Seattle*, 387 U. S. 541, 543, 546 (1967). An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable, see *Katz* v. *United States*, 389 U. S. 347, 361 (1967) (Harlan, J., concurring). This expecta-

---

Code §§ 9–1–3.6–10(a) and (d) and 9–1–3.6–12 (1979 and Supp. 1986); Iowa Code §§ 321.90(3)(b) and 321.95 (1985); Kan. Stat. Ann. § 8–2408(c) (1982); Ky. Rev. Stat. § 177.935(7) (1985); La. Rev. Stat. Ann. § 32:757 (West Supp. 1987); Me. Rev. Stat. Ann., Tit. 29, § 2459 (Supp. 1986); Md. Transp. Code Ann. § 15–105 (Supp. 1986); Mich. Comp. Laws § 257.251 (Supp. 1987); Miss. Code Ann. § 27–19–313 (1972); Mo. Rev. Stat. § 301.225 (Supp. 1986); Mont. Code Ann. §§ 75–10–503 and 75–10–513 (1985); Nev. Rev. Stat. § 482.3263 (1986); N. H. Rev. Stat. Ann. § 261:132 (1982); N. J. Stat. Ann. § 39.10B–2c (West Supp. 1987); N. M. Stat. Ann. § 66–2–12(A)(4) (1984); Okla. Stat., Tit. 47, § 591.6 (Supp. 1987); Ore. Rev. Stat. § 810.480 (1985); R. I. Gen. Laws § 42–14.2–15 (Supp. 1986); S. C. Code § 56–5–5670(b) (1976); S. D. Codified Laws §§ 32–6B–38 to 32–6B–40 (Supp. 1987); Tenn. Code Ann. § 55–14–106 (1980); Tex. Rev. Civ. Stat. Ann., Art. 6687–2(e) (Vernon Supp. 1987); Utah Code Ann. §§ 41–3–23(2) and (4) (Supp. 1987); Vt. Stat. Ann., Tit. 23, § 466 (1978); Va. Code § 46.1–550.12 (Supp. 1986); Wash. Rev. Code §§ 46.80.080(5) and 46.80.150 (1970); W. Va. Code § 17A–6–25 (1986); Wis. Stat. § 218.22(4)(c) (1982); Wyo. Stat. § 31–13–112(e)(iii) (1987).

Courts have upheld such statutes against federal constitutional attack. See, *e. g.*, *Bionic Auto Parts & Sales, Inc.* v. *Fahner*, 721 F. 2d 1072, 1081 (CA7 1983); *People* v. *Easley*, 90 Cal. App. 3d 440, 445, 153 Cal. Rptr. 396, 399, cert. denied, 444 U. S. 899 (1979); *Moore* v. *State*, 442 So. 2d 215, 216 (Fla. 1983); *People* v. *Barnes*, 146 Mich. App. 37, 42, 379 N. W. 2d 464, 466 (1985); *State* v. *Zinmeister*, 27 Ohio App. 3d 313, 318, 501 N. E. 2d 59, 65 (1985); see also *State* v. *Tindell*, 272 Ind. 479, 483, ·399 N. E. 2d 746, 748 (1980); *Shirley* v. *Commonwealth*, 218 Va. 49, 57–58, 235 S. E. 2d 432, 436–437 (1977). But see *People* v. *Krull*, 107 Ill. 2d 107, 116–117, 481 N. E. 2d 703, 707–708 (1985), rev'd, 480 U. S. 340 (1987); *State* v. *Galio*, 92 N. M. 266, 268–269, 587 P. 2d 44, 46–47 (1978).

tion exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes. See *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, 312–313 (1978). An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home. See *Donovan* v. *Dewey,* 452 U. S. 594, 598–599 (1981). This expectation is particularly attenuated in commercial property employed in "closely regulated" industries. The Court observed in *Marshall* v. *Barlow's, Inc.:* "Certain industries have such a history of government oversight that no reasonable expectation of privacy, see *Katz* v. *United States,* 389 U. S. 347, 351–352 (1967), could exist for a proprietor over the stock of such an enterprise." 436 U. S., at 313.

The Court first examined the "unique" problem of inspections of "closely regulated" businesses in two enterprises that had "a long tradition of close government supervision." *Ibid.* In *Colonnade Corp.* v. *United States,* 397 U. S. 72 (1970), it considered a warrantless search of a catering business pursuant to several federal revenue statutes authorizing the inspection of the premises of liquor dealers. Although the Court disapproved the search because the statute provided that a sanction be imposed when entry was refused, and because it did not authorize entry without a warrant as an alternative in this situation, it recognized that "the liquor industry [was] long subject to close supervision and inspection." *Id.,* at 77. We returned to this issue in *United States* v. *Biswell,* 406 U. S. 311 (1972), which involved a warrantless inspection of the premises of a pawnshop operator, who was federally licensed to sell sporting weapons pursuant to the Gun Control Act of 1968, 18 U. S. C. § 921 *et seq.* While noting that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry," 406 U. S., at 315, we nonetheless concluded that the warrantless inspec-

tions authorized by the Gun Control Act would "pose only limited threats to the dealer's justifiable expectations of privacy." *Id.*, at 316. We observed: "When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Ibid.*

The *"Colonnade-Biswell"* doctrine, stating the reduced expectation of privacy by an owner of commercial premises in a "closely regulated" industry, has received renewed emphasis in more recent decisions. In *Marshall* v. *Barlow's, Inc.*, we noted its continued vitality but declined to find that warrantless inspections, made pursuant to the Occupational Safety and Health Act of 1970, 84 Stat. 1598, 29 U. S. C. § 657(a), of *all* businesses engaged in interstate commerce fell within the narrow focus of this doctrine. 436 U. S., at 313–314. However, we found warrantless inspections made pursuant to the Federal Mine Safety and Health Act of 1977, 91 Stat. 1290, 30 U. S. C. § 801 *et seq.*, proper because they were of a "closely regulated" industry. *Donovan* v. *Dewey*, *supra.*

Indeed, in *Donovan* v. *Dewey*, we declined to limit our consideration to the length of time during which the business in question—stone quarries—had been subject to federal regulation. 452 U. S., at 605–606. We pointed out that the doctrine is essentially defined by "the pervasiveness and regularity of the federal regulation" and the effect of such regulation upon an owner's expectation of privacy. See *id.*, at 600, 606. We observed, however, that "the duration of a particular regulatory scheme" would remain an "important factor" in deciding whether a warrantless inspection pursuant to the scheme is permissible. *Id.*, at 606.[12]

---

[12] We explained in *Donovan* v. *Dewey:* "If the length of regulation were the only criterion, absurd results would occur. Under appellees' view, new or emerging industries, including ones such as the nuclear power industry that pose enormous potential safety and health problems,

## B

Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, see *O'Connor* v. *Ortega*, 480 U. S. 709, 741 (1987) (dissenting opinion), have lessened application in this context. Rather, we conclude that, as in other situations of "special need," see *New Jersey* v. *T. L. O.*, 469 U. S. 325, 353 (1985) (opinion concurring in judgment), where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. See *Donovan* v. *Dewey*, 452 U. S., at 602 ("substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines"); *United States* v. *Biswell*, 406 U. S., at 315 (regulation of firearms is "of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders"); *Colonnade Corp.* v. *United States*, 397 U. S., at 75 (federal interest "in protecting the revenue against various types of fraud").

Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." *Donovan* v. *Dewey*, 452 U. S., at 600. For example, in *Dewey* we recognized that forcing mine inspectors to obtain a warrant before every in-

---

could never be subject to warrantless searches even under the most carefully structured inspection program simply because of the recent vintage of regulation." 452 U. S., at 606.

spection might alert mine owners or operators to the impending inspection, thereby frustrating the purposes of the Mine Safety and Health Act—to detect and thus to deter safety and health violations. *Id.*, at 603.

Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Ibid.* In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. See *Marshall* v. *Barlow's, Inc.*, 436 U. S., at 323; see also *id.*, at 332 (STEVENS, J., dissenting). To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan* v. *Dewey*, 452 U. S., at 600. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place, and scope." *United States* v. *Biswell*, 406 U. S., at 315.

## III

### A

Searches made pursuant to § 415–a5, in our view, clearly fall within this established exception to the warrant requirement for administrative inspections in "closely regulated" businesses.[13] First, the nature of the regulatory statute reveals that the operation of a junkyard, part of which is devoted to

---

[13] Because we find the inspection at issue here constitutional under § 415–a5, we have no reason to reach the question of the constitutionality of § 436 of the New York City Charter. Moreover, because the Court of Appeals addressed only the general question concerning the constitutionality of the administrative inspection, not the specific question whether the search and seizure of the wheelchair and walker were within the scope of the inspection, we do not reach here this latter issue.

vehicle dismantling, is a "closely regulated" business in the State of New York.[14]   The provisions regulating the activity of vehicle dismantling are extensive.   An operator cannot engage in this industry without first obtaining a license, which means that he must meet the registration requirements and must pay a fee.[15]   Under § 415–a5(a), the operator must maintain a police book recording the acquisition and disposition of motor vehicles and vehicle parts, and make such records and inventory available for inspection by the police or any agent of the Department of Motor Vehicles.   The operator also must display his registration number prominently at his place of business, on business documentation, and on vehicles and parts that pass through his business.   § 415–a5(b).   Moreover, the person engaged in this activity is subject to criminal penalties, as well as to loss of license or civil fines,

---

[14] The New York Court of Appeals did not imply that automobile junkyards were *not* a "closely regulated" business in that State.   Rather, it found fault with one aspect of the administrative statutes regulating these junkyards.   67 N. Y. 2d, at 344–345, 493 N. E. 2d, at 929–930.   In his brief in opposition to the petition for certiorari, respondent appears to concede that this industry in New York is "closely regulated" by his statement that the New York Legislature could enact a "'comprehensive regulatory scheme'" directed at the industry.   Brief in Opposition 3.

[15] Under § 415–a1, "[n]o person shall engage in the business of or operate as a vehicle dismantler unless there shall have been issued to him a registration in accordance with the provisions of this section."   In making an application for a registration, the operator must provide "a listing of all felony convictions and all other convictions relating to the illegal sale or possession of a motor vehicle or motor vehicle parts, and a listing of all arrests for any such violations by the applicant and any other person required to be named in such application."   § 415–a2.   Section 415–a3 requires that the operator pay a registration fee, and § 415–a4 stipulates that

"no registration shall be issued or renewed unless the applicant has a permanent place of business at which the activity requiring registration is performed which conforms to section one hundred thirty-six of the general municipal law as such section applies and to all local laws or ordinances and the applicant and all persons having a financial interest in the business have been determined by the commissioner to be fit persons to engage in such business."

for failure to comply with these provisions. See §§ 415–a1, 5, and 6.[16] That other States besides New York have imposed similarly extensive regulations on automobile junkyards further supports the "closely regulated" status of this industry. See n. 11, *supra*.

In determining whether vehicle dismantlers constitute a "closely regulated" industry, the "duration of [this] particular regulatory scheme," *Donovan* v. *Dewey*, 452 U. S., at 606, has some relevancy. Section 415–a could be said to be of fairly recent vintage, see 1973 N. Y. Laws, ch. 225, § 1 (McKinney), and the inspection provision of § 415–a5 was added only in 1979, see 1979 N. Y. Laws, ch. 691, § 2 (McKinney). But because the automobile is a relatively new phenomenon in our society and because its widespread use is even newer, automobile junkyards and vehicle dismantlers have not been in existence very long and thus do not have an ancient history of government oversight. Indeed, the indus-

---

[16] The broad extent of the regulation of the vehicle-dismantling industry further is shown by the fact that § 415–a regulates the activities not only of vehicle dismantlers but also of those in similar businesses, such as salvage pool operators, § 415–a1–a, mobile car crushers, § 415–a1–b, itinerant vehicle collectors, § 415–a1–c, vehicle rebuilders, § 415–a8, scrap processors, § 415–a9, and scrap collectors and repair shops, § 415–a10. Moreover, the Commissioner of the Department of Motor Vehicles has promulgated regulations dealing specifically with this industry: *e. g.*, N. Y. Comp. Codes, Rules & Regs., Tit. 15, § 81.2 (1986) (registration); § 81.8 (procedures upon acquisition of junk and salvage vehicles); § 81.10 (vehicle identification numbers); § 81.12 (records).

*Amici* argue that § 415–a does not create a truly administrative scheme, because its provisions are not sufficiently voluminous. See Brief for American Civil Liberties Union et al. as *Amici Curiae* 34–36. Although the number of regulations certainly is a factor in the determination whether a particular business is "closely regulated," the sheer quantity of pages of statutory material is not dispositive of this question. Rather, the proper focus is on whether the "regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan* v. *Dewey*, 452 U. S., at 600. Section 415–a plainly satisfies this criterion.

try did not attract government attention until the 1950's, when all used automobiles were no longer easily reabsorbed into the steel industry and attention then focused on the environmental and aesthetic problems associated with abandoned vehicles. See Landscape 1970: National Conference on the Abandoned Automobile 11; see also Report to the President from the Panel on Automobile Junkyards, White House Conference on Natural Beauty 1 (1965) (statement of Charles M. Haar, Chairman: "There are junkyards and abandoned cars in the streets and along the countryside that are making America ugly, not beautiful").

The automobile-junkyard business, however, is simply a new branch of an industry that has existed, and has been closely regulated, for many years. The automobile junkyard is closely akin to the secondhand shop or the general junkyard. Both share the purpose of recycling salvageable articles and components of items no longer usable in their original form. As such, vehicle dismantlers represent a modern, specialized version of a traditional activity.[17] In New York, general junkyards and secondhand shops long have been subject to regulation. One New York court has explained:

---

[17] A member of the automobile-junkyard industry described it this way:

"Webster says junk is old metal, rags, and rubbish. The word 'junk' can also be used as a verb, and as such would mean to discard. I represent an industry that buys vehicles which are no longer suitable for transportation. These vehicles have been wrecked, damaged, or have otherwise become inoperative. They are taken apart by members of our industry. The components that are still usable are made available to garages, body shops, and the general public as used parts for repair of other vehicles. The portion of the vehicle that is not suitable for parts is passed on to a scrap processor who then transforms the hulk, or the remnants, into a product suitable for resmelting purposes." Junkyards & Solid Waste Disposal in the Highway Environment, Proceedings of National Seminar, June 10–11, 1975, p. 19 (1976) (statement of Donald J. Rouse, National Association of Auto and Truck Recyclers, now known as Automotive Dismantlers and Recyclers of America).

"Vehicle dismantlers are part of the junk industry as well as part of the auto industry. . . . Prior to the enactment of section 415–a of the Vehicle and Traffic Law, auto dismantlers were subject to regulatory provisions governing the licensing and operation of junkyards. These regulations included provisions mandating the keeping of detailed records of purchases and sales, and the making of such records available at reasonable times to designated officials including police officers, by junk dealers . . . and by dealers in secondhand articles . . . .

"These regulatory, record keeping and warrantless inspection provisions for junk shops have been a part of the law of the City of New York and of Brooklyn for at least 140 years." *People* v. *Tinneny*, 99 Misc. 2d 962, 969, 417 N. Y. S. 2d 840, 845 (Sup. 1979).

See also N. Y. C. Charter and Admin. Code § B32–113.01 (1977) ("'Junk dealer'. Any person engaged in the business of purchasing or selling junk"); § B32–126.0a ("'dealer in second-hand articles' shall mean any person who, in any way or as a principal broker or agent: 1. [d]eals in the purchase or sale of second-hand articles of whatever nature").[18] The history of government regulation of junk-related activities argues strongly in favor of the "closely regulated" status of the automobile junkyard.

Accordingly, in light of the regulatory framework governing his business and the history of regulation of related industries, an operator of a junkyard engaging in vehicle dismantling has a reduced expectation of privacy in this "closely regulated" business.

---

[18] In fact, by assuming that Charter § 436 with its use of the terms "junkshop keepers" and "dealers in second-hand merchandise," see n. 8, *supra*, could be applied to respondent, the New York Court of Appeals understood that a vehicle dismantler fell within the scope of those terms. See also *People* v. *Cusumano*, 108 App. Div. 2d 752, 754, 484 N. Y. S. 2d 909, 912 (1985).

## B

The New York regulatory scheme satisfies the three criteria necessary to make reasonable warrantless inspections pursuant to § 415–a5. First, the State has a substantial interest in regulating the vehicle-dismantling and automobile-junkyard industry because motor vehicle theft has increased in the State and because the problem of theft is associated with this industry. In this day, automobile theft has become a significant social problem, placing enormous economic and personal burdens upon the citizens of different States. For example, when approving the 1979 amendment to § 415–a5, which added the provision for inspections of records and inventory of junkyards, the Governor of the State explained:

> "Motor vehicle theft in New York State has been rapidly increasing. It has become a multimillion dollar industry which has resulted in an intolerable economic burden on the citizens of New York. In 1976, over 130,000 automobiles were reported stolen in New York, resulting in losses in excess of $225 million. Because of the high rate of motor vehicle theft, the premiums for comprehensive motor vehicle insurance in New York are significantly above the national average. In addition, stolen automobiles are often used in the commission of other crimes and there is a high incidence of accidents resulting in property damage and bodily injury involving stolen automobiles." Governor's Message approving L. 1979, chs. 691 and 692, 1979 N. Y. Laws 1826, 1826–1827 (McKinney).

See also 25 Legislative Newsletter, New York State Automobile Assn., p. 1 (May 10, 1978), reprinted in Governor's Bill Jacket, L. 1979, ch. 691 (1979 Bill Jacket) ("Auto theft in New York State has become a low-risk, high-profit, multi-

million dollar growth industry that is imposing intolerable economic burdens on motorists").[19]   Because contemporary automobiles are made from standardized parts, the nation-wide extent of vehicle theft and concern about it are understandable.

Second, regulation of the vehicle-dismantling industry reasonably serves the State's substantial interest in eradicating automobile theft.   It is well established that the theft problem can be addressed effectively by controlling the receiver of, or market in, stolen property.   2 W. LaFave & A. Scott, Substantive Criminal Law § 8.10(a), p. 422 (1986) ("Without [professional receivers of stolen property], theft ceases to be profitable"); 2 Encyclopedia of Crime and Justice 789 (Kadish ed. 1983) ("[The criminal receiver] . . . inspires 95 per cent or more of the theft in America").   Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts.   See Memorandum from Paul Goldman, Counsel, State Consumer Protection Board, to Richard A. Brown, Counsel to the Governor (June 29, 1979), 1979 Bill Jacket ("It is believed that a major source of stolen vehicles, parts and registration documentation may involve vehicles which pass through the hands of [junk vehicle] dealers").   Thus, the State rationally may believe that it will reduce car theft by regulations that prevent automobile junkyards from becoming markets for stolen vehicles and that help trace the origin and destination of vehicle parts.[20]

---

[19] A similar concern with stemming the social plague of automobile theft has motivated other States to pass legislation aimed at the vehicle-dismantling industry.   See, e. g., Ill. Rev. Stat., ch. 95½, ¶ 5–100–1 (Supp. 1985) (legislative finding that "crimes involving the theft of motor vehicles and their parts have risen steadily over the past years, with a resulting loss of millions of dollars to the residents of this State").

[20] See Governor's Message approving L. 1979, chs. 691 and 692, 1979 N. Y. Laws 1826, 1827 (McKinney) ("By making it difficult to traffic in stolen vehicles and parts, it can be anticipated that automobile theft problems will be decreased and the cost to insurance companies and the public

Moreover, the warrantless administrative inspections pursuant to § 415–a5 "are necessary to further [the] regulatory scheme." *Donovan* v. *Dewey*, 452 U. S., at 600. In this respect, we see no difference between these inspections and those approved by the Court in *United States* v. *Biswell* and *Donovan* v. *Dewey*. We explained in *Biswell*:

> "[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible." 406 U. S., at 316.

See also *Donovan* v. *Dewey*, 452 U. S., at 603. Similarly, in the present case, a warrant requirement would interfere with the statute's purpose of deterring automobile theft accomplished by identifying vehicles and parts as stolen and shutting down the market in such items. Because stolen cars and parts often pass quickly through an automobile junkyard, "frequent" and "unannounced" inspections are necessary in order to detect them. In sum, surprise is crucial if the regulatory scheme aimed at remedying this major social problem is to function at all.

---

may be reduced"). As the Illinois Legislature found in passing regulations aimed at this industry,

"(2) essential to the criminal enterprise of motor vehicle theft operations is the ability of thieves to transfer or sell stolen vehicles or their parts through legitimate commercial channels making them available for sale to the automotive industry; and (3) motor vehicle dealers, used parts dealers, scrap processors, automotive parts recyclers, and rebuilders are engaged in a type of business which often exposes them and their operations to pressures and influences from motor vehicle thieves; and (4) elements of organized crime are constantly attempting to take control of businesses engaged in the sale and repair of motor vehicles so as to further their own criminal interests." Ill. Rev. Stat., ch. 95½, ¶ 5–100–1 (1985).

See also Kan. Stat. Ann. § 8–2402 (1982); Nev. Rev. Stat. § 482.318 (1985).

Third, § 415–a5 provides a "constitutionally adequate substitute for a warrant." *Donovan* v. *Dewey*, 452 U. S., at 603. The statute informs the operator of a vehicle dismantling business that inspections will be made on a regular basis. *Id.*, at 605. Thus, the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute. See *Marshall* v. *Barlow's, Inc.*, 436 U. S., at 332 (dissenting opinion). Section 415–a5 also sets forth the scope of the inspection and, accordingly, places the operator on notice as to how to comply with the statute. In addition, it notifies the operator as to who is authorized to conduct an inspection.

Finally, the "time, place, and scope" of the inspection is limited, *United States* v. *Biswell*, 406 U. S., at 315, to place appropriate restraints upon the discretion of the inspecting officers. See *Donovan* v. *Dewey*, 452 U. S., at 605. The officers are allowed to conduct an inspection only "during [the] regular and usual business hours." § 415–a5.[21] The inspections can be made only of vehicle-dismantling and related industries. And the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as "any vehicles or parts of vehicles which are subject to

---

[21] Respondent contends that § 415–a5 is unconstitutional because it fails to limit the number of searches that may be conducted of a particular business during any given period. Brief for Respondent 12. While such limitations, or the absence thereof, are a factor in an analysis of the adequacy of a particular statute, they are not determinative of the result so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers. Indeed, we have approved statutes authorizing warrantless inspections even when such statutes did not establish a fixed number of inspections for a particular time period. See *United States* v. *Biswell*, 406 U. S. 311, 312, n. 1 (1972). And we have suggested that, in some situations, inspections must be conducted frequently to achieve the purposes of the statutory scheme. *Id.*, at 316 ("Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even *frequent*, inspections are essential") (emphasis added).

the record keeping requirements of this section and which are on the premises." *Ibid.*[22]

## IV

A search conducted pursuant to § 415–a5, therefore, clearly falls within the well-established exception to the warrant requirement for administrative inspections of "closely regulated" businesses.   The Court of Appeals, nevertheless, struck down the statute as violative of the Fourth Amendment because, in its view, the statute had no truly administrative purpose but was "designed simply to give the police an expedient means of enforcing penal sanctions for possession of stolen property."   67 N. Y. 2d, at 344, 493 N. E. 2d, at 929.   The court rested its conclusion that the administrative goal of the statute was pretextual and that § 415–a5 really "authorize[d] searches undertaken solely to uncover evidence of criminality" particularly on the fact that, even if an operator failed to produce his police book, the inspecting officers could continue their inspection for stolen vehicles and parts.   *Id.*, at 344, 345, 493 N. E. 2d, at 929, 930.   The court also suggested that the identity of the inspectors—police officers—was significant in revealing the true nature of the statutory scheme.   *Id.*, at 344, 493 N. E. 2d, at 929.

In arriving at this conclusion, the Court of Appeals failed to recognize that a State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions.   Administrative statutes and penal laws may have the same *ultimate* purpose of remedying the social problem, but they have different subsidiary purposes and prescribe different methods of addressing the problem.   An administrative statute establishes how a particular business in a

---

[22] With respect to the adequacy of the statutory procedures, this case is indistinguishable from *United States* v. *Biswell.*   There, the regulatory provisions of the Gun Control Act permitted warrantless inspections of *both* records *and* inventory "at all reasonable times."   *Id.*, at 312, n. 1. The Court held that the statute gave a firearms dealer adequate notice of "the purposes of the inspector [and] the limits of his task."   *Id.*, at 316.

"closely regulated" industry should be operated, setting forth rules to guide an operator's conduct of the business and allowing government officials to ensure that those rules are followed. Such a regulatory approach contrasts with that of the penal laws, a major emphasis of which is the punishment of individuals for specific acts of behavior.

In *United States* v. *Biswell*, we recognized this fact that both administrative and penal schemes can serve the same purposes by observing that the ultimate purposes of the Gun Control Act were "to prevent violent crime and to assist the States in regulating the firearms traffic within their borders." 406 U. S., at 315. It is beyond dispute that certain state penal laws had these same purposes. Yet the regulatory goals of the Gun Control Act were narrower: the Act ensured that "weapons [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms." *Id.*, at 315–316. The provisions of the Act, including those authorizing the warrantless inspections, served these immediate goals and also contributed to achieving the same ultimate purposes that the penal laws were intended to achieve.

This case, too, reveals that an administrative scheme may have the same ultimate purpose as penal laws, even if its regulatory goals are narrower. As we have explained above, New York, like many States, faces a serious social problem in automobile theft and has a substantial interest in regulating the vehicle-dismantling industry because of this problem. The New York penal laws address automobile theft by punishing it or the possession of stolen property, including possession by individuals in the business of buying and selling property. See n. 6, *supra*.[23] In accordance with its interest

---

[23] The penal laws often are changed in response to the growth of a particular type of crime. For example, in 1986 New York amended its definition of grand larceny to include the following provision:

in regulating the automobile-junkyard industry, the State also has devised a regulatory manner of dealing with this problem. Section 415–a, as a whole, serves the regulatory goals of seeking to ensure that vehicle dismantlers are legitimate businesspersons and that stolen vehicles and vehicle parts passing through automobile junkyards can be identified.[24] In particular, § 415–a5 was designed to contribute to these goals, as explained at the time of its passage:

> "This bill attempts to provide enforcement not only through means of law enforcement but by making it unprofitable for persons to operate in the stolen car field.

---

"A person is guilty of grand larceny in the fourth degree when he steals property and when:

. . . . .

"8. The value of the property exceeds one hundred dollars and the property consists of a motor vehicle, as defined in section one hundred twenty-five of the vehicle and traffic law, other than a motorcycle, as defined in section one hundred twenty-three of such law." 1986 N. Y. Laws, ch. 515, § 1 (McKinney), codified at N. Y. Penal Law § 155.30 (McKinney Supp. 1987).

[24] See, e. g., Memorandum of State Department of Motor Vehicles in support of 1973 N. Y. Laws, ch. 225, 1973 N. Y. Laws 2166, 2167 (McKinney) (purpose of § 415–a "is to provide a system of record keeping so that vehicles can be traced through junk yards and to assure that such junk yards are run by legitimate business men rather than by auto theft rings"); Letter of John D. Caemmerer, Chairman of Senate Committee on Transportation, to Michael Whiteman, Counsel to the Governor (Apr. 12, 1973), reprinted in Governor's Bill Jacket, L. 1973, ch. 225, p. 15 (1973 Bill Jacket) ("This bill establishes much needed safeguards for an industry which can be readily infiltrated by those wishing to dispose of stolen automobiles or automobile parts"); Letter of Peter M. Pryor, Chairman of New York State Consumer Protection Board, to Michael Whiteman, Counsel to the Governor (Apr. 18, 1973), 1973 Bill Jacket, p. 6 ("Organized crime has used the junk and salvage industry as a convenient staging ground for illicit activities concerning motor vehicles as well as for operations into other areas. The proposed legislation opens the junk and salvage business to the scrutiny of the police and the Department of Motor Vehicles thereby reducing the possibility of utilizing such dealerships as covers for covert businesses").

"The various businesses which are engaged in this operation have been studied and the control and requirements on the businesses have been written in a manner which would permit the persons engaged in the business to legally operate in a manner conducive to good business practices while making it extremely difficult for a person to profitably transfer a stolen vehicle or stolen part. The general scheme is to identify every person who may legitimately be involved in the operation and to provide a record keeping system which will enable junk vehicles and parts to be traced back to the last legitimately registered or titled owner. Legitimate businessmen engaged in this field have complained with good cause that the lack of comprehensive coverage of the field has put them at a disadvantage with persons who currently are able to operate outside of statute and regulations. They have also legitimately complained that delays inherent in the present statutory regulation and onerous record keeping requirements have made profitable operation difficult.

"The provisions of this bill have been drafted after consultation with respected members of the various industries and provides [sic] a more feasible system of controlling traffic in stolen vehicles and parts." Letter of Stanley M. Gruss, Deputy Commissioner and Counsel, to Richard A. Brown, Counsel to the Governor (June 20, 1979), 1979 Bill Jacket.

Accordingly, to state that § 415–a5 is "really" designed to gather evidence to enable convictions under the penal laws is to ignore the plain administrative purposes of § 415–a, in general, and § 415–a5, in particular.

If the administrative goals of § 415–a5 are recognized, the difficulty the Court of Appeals perceives in allowing inspecting officers to examine vehicles and vehicle parts even in the absence of records evaporates. The regulatory purposes of § 415–a5 certainly are served by having the inspecting offi-

cers compare the records of a particular vehicle dismantler with vehicles and vehicle parts in the junkyard. The purposes of maintaining junkyards in the hands of legitimate businesspersons and of tracing vehicles that pass through these businesses, however, *also* are served by having the officers examine the operator's inventory even when the operator, for whatever reason, fails to produce the police book.[25] Forbidding inspecting officers to examine the inventory in this situation would permit an illegitimate vehicle dismantler to thwart the purposes of the administrative scheme and would have the absurd result of subjecting his counterpart who maintained records to a more extensive search.[26]

Nor do we think that this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself. In *United States* v. *Biswell*, the pawnshop operator was charged not only with a violation of the recordkeeping provision, pursuant to which the inspection was made, but also with other violations detected during the inspection, see 406 U. S., at 313, n. 2, and convicted of a failure to pay an occupational tax for dealing in specific firearms, *id.*, at 312–313. The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect. Cf. *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 583–584, and n. 3 (1983).[27]

---

[25] Failure to produce a record is a misdemeanor, § 415–a5, which can be a ground for suspension of the operator's license, § 415–a6. This suspension serves to remove illegitimate operators from the industry.

[26] Indeed, in *United States* v. *Biswell*, we found no constitutional problem with a statute that authorized inspection both of records and inventory, 406 U. S., at 312, n. 1, and with an actual inspection of a dealer's premises despite the fact that the dealer's records were not properly maintained, *id.*, at 313, n. 2.

[27] The legislative history of § 415–a, in general, and § 415–a5, in particular, reveals that the New York Legislature had proper regulatory purposes for enacting the administrative scheme and was not using it as a

Finally, we fail to see any constitutional significance in the fact that police officers, rather than "administrative" agents, are permitted to conduct the § 415–a5 inspection. The significance respondent alleges lies in the role of police officers as enforcers of the penal laws and in the officers' power to arrest for offenses other than violations of the administrative scheme. It is, however, important to note that state police officers, like those in New York, have numerous duties in addition to those associated with traditional police work. See *People* v. *De Bour*, 40 N. Y. 2d 210, 218, 352 N. E. 2d 562, 568 (1976) ("To consider the actions of the police solely in terms of arrest and criminal process is an unnecessary distortion"); see also ABA Standards for Criminal Justice 1–1.1(b) and commentary (2d ed. 1980, Supp. 1982). As a practical matter, many States do not have the resources to assign the enforcement of a particular administrative scheme to a specialized agency. So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.[28] In

---

"pretext" to enable law enforcement authorities to gather evidence of penal law violations. See *supra*, at 714–715 and n. 24; see also *Illinois* v. *Krull*, 480 U. S. 340, 351 (1987) ("[W]e are given no basis for believing that legislators are inclined to subvert their oaths and the Fourth Amendment"). There is, furthermore, no reason to believe that the instant inspection was actually a "pretext" for obtaining evidence of respondent's violation of the penal laws. It is undisputed that the inspection was made solely pursuant to the administrative scheme. In fact, because the search here was truly a § 415–a5 inspection, the Court of Appeals was able to reach in this case, as it could not in *People* v. *Pace*, 65 N. Y. 2d 684, 481 N. E. 2d 250 (1985), the question of the constitutionality of the statute. See 67 N. Y. 2d, at 342–343, 493 N. E. 2d, at 928; see also n. 7, *supra*.

[28] In *United States* v. *Biswell*, the search in question was conducted by a city police officer and by a United States Treasury agent, 406 U. S., at 312, the latter being authorized to make arrests for federal crimes. See 27 CFR § 70.28 (1986). The Internal Revenue agents involved in the search in *Colonnade Corp.* v. *United States*, 397 U. S. 72, 73 (1970), had similar powers. See 26 U. S. C. § 7608(a).

sum, we decline to impose upon the States the burden of requiring the enforcement of their regulatory statutes to be carried out by specialized agents.

### V

Accordingly, the judgment of the New York Court of Appeals is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE O'CONNOR joins as to all but Part III, dissenting.

Warrantless inspections of pervasively regulated businesses are valid if necessary to further an urgent state interest, and if authorized by a statute that carefully limits their time, place, and scope. I have no objection to this general rule. Today, however, the Court finds pervasive regulation in the barest of administrative schemes. Burger's vehicle-dismantling business is not closely regulated (unless most New York City businesses are), and an administrative warrant therefore was required to search it. The Court also perceives careful guidance and control of police discretion in a statute that is patently insufficient to eliminate the need for a warrant. Finally, the Court characterizes as administrative a search for evidence of only criminal wrongdoing. As a result, the Court renders virtually meaningless the general rule that a warrant is required for administrative searches of commercial property.[1]

### I

In *See* v. *City of Seattle*, 387 U. S. 541, 543 (1967), we held that an administrative search of commercial property gener-

---

[1] The Court does not reach the question whether the search was lawful under New York City Charter and Admin. Code § 436 (Supp. 1985). I agree with the analysis of the New York Court of Appeals, holding that this provision is plainly unconstitutional.

ally must be supported by a warrant. We make an exception to this rule, and dispense with the warrant requirement, in cases involving "closely regulated" industries, where we believe that the commercial operator's privacy interest is adequately protected by detailed regulatory schemes authorizing warrantless inspections. See *Donovan* v. *Dewey*, 452 U. S. 594, 599 (1981).[2] The Court has previously made clear that "the closely regulated industry . . . is the exception." *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313 (1978). Unfortunately, today's holding makes it the rule.

Initially, the Court excepted from the administrative-warrant requirement only industries which possessed a "'long tradition of government regulation,'" *Donovan* v. *Dewey, supra,* at 605, quoting *Marshall* v. *Dewey*, 493 F. Supp. 963, 964 (1980), or which involved an "inherent and immediate danger to health or life." Note, 48 Ind. L. J. 117, 120–121 (1972).[3] The Court today places substantial reliance on the historical justification, and maintains that vehicle dismantling is part of the general junk and secondhand industry, which has a long history of regulation. In *Dewey*, however, we clarified that, although historical supervision may help to demonstrate that close regulation exists, it is "the pervasiveness and regularity of . . . regulation that ultimately determines whether a warrant is necessary to render

---

[2] In only three industries have we invoked this exception. See *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970) (liquor industry); *United States* v. *Biswell*, 406 U. S. 311 (1972) (firearm and ammunitions sales); *Donovan* v. *Dewey*, 452 U. S. 594 (1981) (coal mining).

[3] Compare *Biswell, supra,* at 315 (permitting warrantless searches because, although regulation of firearms not as deeply rooted in history as control of the liquor industry, "close scrutiny of this traffic is undeniably of central importance to federal efforts to prevent violent crime"); *Dewey, supra,* at 602 (permitting warrantless searches in mining industry, which ranks "among the most hazardous in the country"), with *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307 (1978) (requiring warrant when statute authorizes agency to perform health and safety inspections of all businesses engaged in interstate commerce).

an inspection program reasonable under the Fourth Amendment." 452 U. S., at 606.[4]

The provisions governing vehicle dismantling in New York simply are not extensive. A vehicle dismantler must register and pay a fee, display the registration in various circumstances, maintain a police book, and allow inspections. See N. Y. Veh. & Traf. Law §§ 415–a1–6 (McKinney 1986). Of course, the inspections themselves cannot be cited as proof of pervasive regulation justifying elimination of the warrant requirement; that would be obvious bootstrapping. Nor can registration and recordkeeping requirements be characterized as close regulation. New York City, like many States and municipalities, imposes similar, and often more stringent licensing, recordkeeping, and other regulatory requirements on a myriad of trades and businesses.[5]

---

[4] Moreover, it is "a long tradition of *close* government supervision" that is relevant to a finding that a business is closely regulated. *Id.*, at 313 (emphasis added). Historically, government regulation of the general junk and secondhand industry was roughly equivalent to the modern regulation discussed *infra*. Neither the general junk industry, nor the vehicle-dismantling industry, is or ever has been pervasively regulated.

[5] See licensing and regulatory requirements described in New York City Charter and Admin. Code § B32–1.0 (1977 and Supp. 1985) (exhibitors of public amusement or sport), § B32–22.0 (motion picture exhibitions), § B32–45.0 (billiard and pocket billiard tables), § B32–46.0 (bowling alleys), § B32–54.0 (sidewalk cafes), § B32–58.0 (sidewalk stands), § B32–76.0 (sight-seeing guides), § B32–93.0 (public carts and cartmen), § B32–98.0 (debt collection agencies), § B32–135.0 (pawnbrokers), § B32–138.0 (auctioneers), § B32–167.0 (laundries), § B32–183.0 (locksmiths and keymakers), § B32–206.0 (sales), § B32–251.0 (garages and parking lots), § B32–267.0 (commercial refuse removal), § B32–297.0 (public dance halls, cabarets, and catering establishments), § B32–311.0 (coffeehouses), § B32–324.0 (sight-seeing buses and drivers), § B32–352.0 (home improvement business), § B32–467.0 (television, radio, and audio equipment phonograph service and repairs), § B32–491.0 (general vendors), § B32–532.0 (storage warehouses).

New York State has equally comprehensive licensing and permit requirements. See N. Y. Exec. Law § 875 (McKinney Supp. 1987):

Few substantive qualifications are required of an aspiring vehicle dismantler; no regulation governs the condition of the premises, the method of operation, the hours of operation, the equipment utilized, etc. This scheme stands in marked contrast to, *e. g.*, the mine safety regulations relevant in *Donovan* v. *Dewey*, *supra*.[6]

In sum, if New York City's administrative scheme renders the vehicle-dismantling business closely regulated, few businesses will escape such a finding. Under these circumstances, the warrant requirement is the exception not the rule, and *See* has been constructively overruled.[7]

## II

Even if vehicle dismantling were a closely regulated industry, I would nonetheless conclude that this search violated the Fourth Amendment. The warrant requirement protects

"More than thirty-five state agencies issue rules and permits affecting businesses, organizations and individuals. Permits number in the hundreds in statute with still more in rules and regulations. Those who are regulated move in a maze of rules, permits, licenses, and approvals."

[6] This is not an assertion that some minimal number of pages is a prerequisite to a finding of close regulation, see *ante*, at 705, n. 16; instead, it is an assertion about the minimal substantive scope of the regulations. The Mine Safety and Health Act at issue in *Dewey*, *supra*, mandated inspection of all mines, defined the frequency of inspection (at least twice annually for surface mines, four times annually for underground mines, and irregular 5-, 10-, or 15-day intervals for mines that generate explosive gases), mandated followup inspections where violations had been found, mandated immediate inspection upon notification by a miner or miner's representative that a dangerous condition exists, required compliance with elaborate standards set forth in the Act and in Title 30 of the Code of Federal Regulations, and required individual notification to mine operators of all standards proposed pursuant to the Act. See *Dewey*, *supra*, at 604.

[7] The Court further weakens limitations on the closely regulated industries category when it allows the government to proceed without a warrant upon a showing of a *substantial* state interest. See *ante*, at 702, 708. The Court should require a warrant for inspections in closely regulated industries unless the inspection scheme furthers an *urgent* governmental interest. See *Dewey*, *supra*, at 599–600, *Biswell*, *supra*, at 317.

the owner of a business from the "unbridled discretion [of] executive and administrative officers," *Marshall, supra,* at 323, by ensuring that "reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [business]," *Camara* v. *Municipal Court,* 387 U. S. 523, 538 (1967). In order to serve as the equivalent of a warrant, an administrative statute must create "a predictable and guided [governmental] presence," *Dewey,* 452 U. S., at 604. Section 415–a5 does not approach the level of "certainty and regularity of . . . application" necessary to provide "a constitutionally adequate substitute for a warrant." *Id.,* at 603.[8]

The statute does not inform the operator of a vehicle-dismantling business that inspections will be made on a regular basis; in fact, there is *no* assurance that any inspections at all will occur.[9] There is neither an upper nor a lower limit on the number of searches that may be conducted at any given operator's establishment in any given time period.[10]

[8] I also dispute the contention that warrantless searches are necessary to further the regulatory scheme, because of the need for unexpected and/or frequent searches. If surprise is essential (as it usually is in a criminal case), a warrant may be obtained *ex parte.* See W. LaFave, Search and Seizure § 10.2(e), p. 653 (1987). If the State seeks to conduct frequent inspections, then the statute (or some regulatory authority) should somewhere inform the industry of that fact.

[9] See § 415–a5(a) ("Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises").

[10] In *Dewey, supra,* of course, there was no upper limit on the number of mine inspections that could occur each year, but because the statute provided for the inspection of each mine every year, the chance that any particular mine would be singled out for repeated or intensive inspection was diminished. See 452 U. S., at 599 (inspections may not be so "random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials").

Neither the statute, nor any regulations, nor any regulatory body, provides limits or guidance on the selection of vehicle dismantlers for inspection. In fact, the State could not explain why Burger's operation was selected for inspection. 67 N. Y. 2d 338, 341, 493 N. E. 2d 926, 927 (1986). This is precisely what was objectionable about the inspection scheme invalidated in *Marshall:* It failed to "provide any standards to guide inspectors either in their selection of establishments to be searched or in the exercise of their authority to search." *Dewey, supra,* at 601.

The Court also maintains that this statute effectively limits the scope of the search. We have previously found significant that "the standards with which a [business] operator is required to comply are all specifically set forth," 452 U. S., at 604, reasoning that a clear and complete definition of potential administrative violations constitutes an implied limitation on the scope of any inspection. Plainly, a statute authorizing a search which can uncover *no* administrative violations is not sufficiently limited in scope to avoid the warrant requirement. This statute fails to tailor the scope of administrative inspection to the particular concerns posed by the regulated business. I conclude that "the frequency and purpose of the inspections [are left] to the unchecked discretion of Government officers." *Ibid.* The conduct of the police in this case underscores this point. The police removed identification numbers from a walker and a wheelchair, neither of which fell within the statutory scope of a permissible administrative search.

The Court also finds significant that an operator is on notice as to who is authorized to search the premises; I do not find the statutory limitation—to "any police officer" or "agent of the commissioner"—significant. The *sole* limitation I see on a police search of the premises of a vehicle dismantler is that it must occur during business hours; otherwise it is open season. The unguided discretion afforded police in this scheme precludes its substitution for a warrant.

## III

The fundamental defect in § 415–a5 is that it authorizes searches intended solely to uncover evidence of criminal acts. The New York Court of Appeals correctly found that § 415–a5 authorized a search of Burger's business "solely to discover whether defendant was storing stolen property on his premises." 67 N. Y. 2d, at 345, 493 N. E. 2d, at 930. In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations. See *Michigan* v. *Clifford,* 464 U. S. 287, 292 (1984) (opinion of POWELL, J.) (in fire investigation, the constitutionality of a postfire inspection depends upon "whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity"); *Michigan* v. *Tyler,* 436 U. S. 499, 508 (1978) ("'if the authorities are seeking evidence to be used in a criminal prosecution, the usual standard of probable cause will apply'") (citations omitted); *Donovan* v. *Dewey, supra,* at 598, n. 6 ("[Warrant and probable-cause requirements] pertain when commercial property is searched for contraband or evidence of crime"); *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 278 (1973) (POWELL, J., concurring) (traditional probable cause not required in border automobile searches because they are "undertaken primarily for administrative rather than prosecutorial purposes"); *Camara* v. *Municipal Court, supra,* at 539 (authorization of administrative searches on less than probable cause will not "endange[r] time-honored doctrines applicable to criminal investigations"); *See* v. *City of Seattle,* 387 U. S., at 549 (Clark, J., dissenting) ("[N]othing . . . suggests that the inspection was . . . designed as a basis for a criminal prosecution"); *Abel* v. *United States,* 362 U. S. 217, 226 (1960) ("The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in

a criminal case must meet stern resistance by the courts"); *id.*, at 248 (Douglas, J., dissenting) (Government cannot evade the Fourth Amendment "by the simple device of wearing the masks of [administrative] officials while in fact they are preparing a case for criminal prosecution"); *Frank* v. *Maryland*, 359 U. S. 360, 365 (1959) ("[E]vidence of criminal action may not . . . be seized without a judicially issued search warrant").[11]

Here the State has used an administrative scheme as a pretext to search without probable cause for evidence of criminal violations. It thus circumvented the requirements of the Fourth Amendment by altering the label placed on the search. This crucial point is most clearly illustrated by the fact that the police copied the serial numbers from a wheelchair and a handicapped person's walker that were found on the premises, and determined that these items had been stolen. Obviously, these objects are not vehicles or parts of vehicles, and were in no way relevant to the State's enforcement of its administrative scheme. The scope of the search alone reveals that it was undertaken solely to uncover evidence of criminal wrongdoing.[12]

Moreover, it is factually impossible that the search was intended to discover wrongdoing subject to administrative

---

[11] In *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), using the presently relevant example of a search for stolen goods, the Court stated that "public interest would hardly justify a sweeping search of an entire city conducted in the hope that these goods might be found. Consequently, a search for these goods . . . is 'reasonable' only when there is 'probable cause' to believe that they will be uncovered in a particular dwelling." *Id.*, at 535.

[12] Thus, I respectfully disagree with the Court's conclusion that there is "no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws." *Ante*, at 717, n. 27. Inspection of the serial numbers on the wheelchair and walker demonstrates that the search went beyond any conceivable administrative purpose. At least the second and third counts of Burger's indictment for possession of stolen property, which involve the wheelchair and the walker, must be dismissed.

sanction. Burger stated that he was not registered to dismantle vehicles as required by § 415–a1, and that he did not have a police book, as required by § 415–a5(a).[13] At that point he had violated every requirement of the administrative scheme. There is no administrative provision forbidding possession of stolen automobiles or automobile parts.[14] The inspection became a search for evidence of criminal acts when all possible administrative violations had been uncovered.[15]

The State contends that acceptance of this argument would allow a vehicle dismantler to thwart its administrative scheme simply by failing to register and keep records. This is false.

---

[13] These omissions also subjected him to potential criminal liability; it is a class E felony to fail to register, § 415–a1, and a class A misdemeanor to fail to produce a police book, § 415–a5(a).

[14] Had Burger been registered as a vehicle dismantler, his registration could have been revoked for illegal possession of stolen vehicles or vehicle parts, and the examination of the vehicles and vehicle parts on his lot would have had an administrative purpose. But he was not registered.

[15] In *Michigan* v. *Clifford,* 464 U. S. 287 (1984), a case involving an administrative inspection seeking the cause and origin of a fire, the Court was "unanimous in [the] opinion that after investigators have determined the cause of the fire and located the place it originated, a search of other portions of the premises may be conducted only pursuant to a warrant, issued upon probable cause that a crime has been committed." *Id.,* at 300 (Stevens, J., concurring); see also *id.,* at 294 ("Circumstances that justify a warrantless search for the cause of a fire may not justify a search to gather evidence of criminal activity once that cause has been determined"); *id.,* at 306 (Rehnquist, J., dissenting) ("[A]lthough the remaining parts of the house could not have been searched without the issuance of a warrant issued upon probable cause" the basement was properly searched for the cause and origin of the fire). Thus, "fire officials [could] not . . . rely on [evidence of criminal activity discovered during the course of a valid administrative search] to expand the scope of their administrative search without first making a showing of probable cause to an independent judicial officer." *Id.,* at 294. Likewise here, the administrative inspection ceased when all administrative purposes had been fulfilled. Further investigation was necessarily a search for evidence of criminal violations, and a warrant based on probable cause was required.

A failure to register or keep required records violates the scheme and results in both administrative sanctions and criminal penalties. See n. 13, *supra*. Neither is the State's further criminal investigation thwarted; the police need only obtain a warrant and then proceed to search the premises. If respondent's failure to register and maintain records amounted to probable cause, then the inspecting police officers, who worked in the Auto Crimes Division of the New York City Police Department, possessed probable cause to obtain a criminal warrant authorizing a search of Burger's premises.[16] Several of the officers might have stayed on the premises to ensure that this unlicensed dismantler did no further business, while the others obtained a warrant. Any inconvenience to the police would be minimal, and in any event, "inconvenience alone has never been thought to be an adequate reason for abrogating the warrant requirement." *Almeida-Sanchez*, 413 U. S., at 283 (POWELL, J., concurring).

The Court properly recognizes that "a State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions." *Ante*, at 712. Ad-

---

[16] Although the fact that the police conducted the search is not dispositive as to its administrative or criminal nature, it should caution the Court to proceed with care, because "[s]earches by the police are inherently more intrusive than purely administrative inspections. Moreover, unlike administrative agents, the police have general criminal investigative duties which exceed the legitimate scope and purposes of purely administrative inspections." *Commonwealth* v. *Lipomi*, 385 Mass. 370, 378, 432 N. E. 2d 86, 91 (1982). See also W. LaFave, Criminal Search and Seizure § 10.2(f), p. 661 (1987) ("[E]xisting scope limitations would be entitled to somewhat greater weight where by law the inspections may be conducted only by specialized inspectors who could be expected to understand and adhere to the stated scope limitations, rather than by any law enforcement officer"); *United States ex rel. Terraciano* v. *Montanye*, 493 F. 2d 682, 685 (CA2 1974) (Friendly, J.) (emphasizing the amendment of the New York statute on inspection of drug records "to restrict the right of inspection to representatives of the Health Department, . . . rather than 'all peace officers within the state'").

ministrative violations may also be crimes, and valid adminis-
trative inspections sometimes uncover evidence of crime; nei-
ther of these facts necessarily creates constitutional problems
with an inspection scheme.    In this case, the problem is en-
tirely different.    In no other administrative search case has
this Court allowed the State to conduct an "administrative
search" which violated no administrative provision and had
no possible administrative consequences.[17]

The Court thus implicitly holds that if an administrative
scheme has certain goals and if the search serves those goals,
it may be upheld even if no concrete administrative con-
sequences could follow from a particular search.    This is
a dangerous suggestion, for the goals of administrative
schemes often overlap with the goals of the criminal law.
Thus, on the Court's reasoning, administrative inspections
would evade the requirements of the Fourth Amendment so
long as they served an abstract administrative goal, such as
the prevention of automobile theft.    A legislature cannot ab-
rogate constitutional protections simply by saying that the
purpose of an administrative search scheme is to prevent a
certain type of crime.    If the Fourth Amendment is to retain
meaning in the commercial context, it must be applied to
searches for evidence of criminal acts even if those searches
would also serve an administrative purpose, unless that ad-
ministrative purpose takes the concrete form of seeking an
administrative violation.[18]

---

[17] This case thus does not present the more difficult question whether a
State could take any criminal conduct, make it an administrative violation,
and then search without probable cause for violations of the newly created
administrative rule.    The increasing overlap of administrative and crimi-
nal violations creates an obvious temptation for the State to do so, and
plainly toleration of this type of pretextual search would allow an end run
around the protections of the Fourth Amendment.

[18] Today's holding, of course, does not preclude consideration of the law-
fulness of the search under the State Constitution.    See *People* v. *P. J.
Video, Inc.*, 68 N. Y. 2d 296, 501 N. E. 2d 556 (1986); *People* v. *Class*, 67
N. Y. 2d 431, 494 N. E. 2d 444 (1986).

## IV

The implications of the Court's opinion, if realized, will virtually eliminate Fourth Amendment protection of commercial entities in the context of administrative searches. No State may require, as a condition of doing business, a blanket submission to warrantless searches for any purpose. I respectfully dissent.