# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 23, 2002 Session

## STATE OF TENNESSEE v. JACK ROGER NORTON

**Direct Appeal from the Criminal Court for Washington County**
**No. 26213     Robert E. Cupp, Judge**

**No. E2001-01903-CCA-R3-CD**
**July 18, 2002**

The State has appealed from the trial court's order granting the Motion to Suppress filed by Defendant, Jack Roger Norton. Defendant is the owner of a tavern in Washington County, which was the subject of a valid search warrant. It is undisputed that the officers did not "knock and announce" prior to their entry into the building to execute the warrant. This failure was the basis of the trial court's ruling. After a thorough review of the record, the applicable law, and based upon the specific, narrow issue presented, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JERRY L. SMITH, J., filed a concurring opinion.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Joe Crumley, District Attorney General; and Steve Finney, Assistant District Attorney General, for the appellant, State of Tennessee.

James T. Bowman, Johnson City, Tennessee, for the appellee, Jack Roger Norton.

## OPINION

The search warrant was not made an exhibit at the suppression hearing and, thus, it is not included in the record. In an appeal involving a search warrant, the appellant's failure to prepare an adequate record would normally result in summary affirmance of the judgment of the trial court. See State v. Johnson, 854 S.W.2d 897, 900-02 (Tenn. Crim. App. 1993). However, the issue presented for review here does not pertain to the validity of the search warrant. Defendant concedes that the search warrant was valid, but contends that the execution of the search warrant was improper. Specifically, Defendant argues that the failure of law enforcement officers to "knock and announce" prior to entering his establishment warrants our affirmance of the trial court's order. Therefore, we will address the merits of the State's appeal.

1

# FACTS

On the night of April 28, 2000, at approximately midnight, officers of the Washington County Drug Task Force ("DTF") executed a search warrant at a tavern known as "The Weed." The tavern was open for business at the time, with six or seven patrons inside. Defendant, the owner of the establishment, was also present.

Sergeant Keith Sexton, a member of the Washington County Sheriff's Department SWAT team since its inception in 1993, commanded the SWAT unit. Sexton testified that it is common for the SWAT team to participate in the execution of search warrants where weapons are involved. The team's job is to make "initial entry" to "secure everyone in the establishment." According to Sexton, the SWAT team is present "for safety only," and the members "do not participate in the search." In this case, the SWAT team was told that Defendant was "suspected" of possessing either a sawed-off shotgun or sub-machine gun. The trial court, in its findings of fact, concluded that this suspicion was nothing more than a "hunch." A small caliber pistol was found in a box behind the bar. Defendant was not charged with any criminal offense regarding the pistol.

Sexton described the type of clothing worn by the SWAT team members at the time they entered the tavern. A picture of Sexton wearing the described apparel was introduced into evidence. A black Nomex mask called a "balaclava" covered the entire head and neck area, except for the nose, eyes, and a small portion of the forehead. The eyes of each SWAT team member were covered with goggles or glasses, and green Nomex gloves covered their hands. The men wore olive drab pants and long-sleeved shirts, with a black "load bearing vest." The word "SHERIFF" was printed in yellow letters approximately 1 to 1.5 inches high on the left chest of the vest and in letters 2.5 to 3 inches high on the back of each vest. Standard-sized law enforcement patches appeared on both upper sleeves of the shirt, and a standard-sized Sheriff's Department metal badge was attached to a pistol holster strap on the right thigh area.

Sexton testified that the tavern was open for business when the SWAT team arrived. The entry door was closed, but unlocked. The SWAT team pushed the door open "as if we were walking into the bar for anything else." As they entered, three of the SWAT team members, including Sexton, yelled, "Sheriff's Office, search warrant, get on the ground." Almost immediately after entry, Sexton took off his mask because a female patron he recognized from a prior arrest appeared to be panicking. Within three or four minutes, the other SWAT team members had also removed their masks. Sexton acknowledged that the SWAT team's "speed of action" had probably caused the woman to panic. Sexton explained that the team's "tactics upon entry" are designed to distract and control the persons present, causing sensory overload with an effect similar to that of a "flash-bang" grenade. The purpose of this maneuver was to "secure" the occupants before they "have a chance to act against" a SWAT team member.

Sexton testified that the SWAT team was armed with three 18K MP 59 millimeter sub-machine guns and two Mossberg 590 12 gauge shotguns upon entry. The distance from the entry doorway to the nearest corner of the bar was approximately 15 to 20 feet. The SWAT team members

2

entered the establishment quickly and fanned out inside the room, with their weapons held in the "low ready position."

The following excerpts from Sexton's testimony are further enlightening as to what occurred when the SWAT team entered "The Weed" on the night of the search:

THE COURT: Well, let me ask you this, Officer, and I'll get out of this thing in a minute. I just--I want to know this--this--do you think that you were at that establishment that night, and you--you were at a bar drinking a beer, and somebody walked in with that black hood on, this day in time, that you would look to see if they had any patches? Do you think they'd even be looking at your arm, or would they be looking at your face, and the mask, and what you had in your hand? What would logically tell that they would be looking [sic]?

[SEXTON]: I don't think, in my personal opinion, that I would be like this man here, it's just like, and I've had them held in my face before; if a man's got a gun in your face I don't see anything but the gun.

THE COURT: You don't see anything but that gun when they walked in. Would it be fair to say that in your training is that's what they see is that gun isn't it [sic], and in this case that black mask?

[SEXTON]: Yes, sir. I don't matter think it would matter [sic], you know, if we wore pink it wouldn't . . .

THE COURT: Okay. I agree with you. I appreciate that honesty, Officer, I really do. Have you a seat . . . .

\* \* \*

[DEFENSE]: Okay. Now, who--you--you had told us that you're SWAT team commander. Who makes the decision whether to use a SWAT team or not?

[SEXTON]: Well, ultimately, the sheriff.

[DEFENSE]: Well, but, not you?

[SEXTON]: No, sir.

3

[DEFENSE]:      You're called and they're saying, you know, we want the SWAT team, or we have authority to use the SWAT team, or whatever, and you're told what the situation is, and your job is simply to act like a SWAT team?

[SEXTON]:       Our job is to ensure the security of the law enforcement officers there, also, any other public citizens there.

                        *       *       *

[DEFENSE]:      All right.  Did you--I--I think we've heard you say that you simply secure the area, and that securing the area is putting people on the ground, is that right?

[SEXTON]:       Yes, sir.

[DEFENSE]:      Putting handcuffs on them?

[SEXTON]:       Yes, sir.

[DEFENSE]:      And do--do you search them?

[SEXTON]:       No, sir.  We pat them down for weapons.

[DEFENSE]:      Okay.  Now, did you do that to some particular individual?

[SEXTON]:       I probably searched one or two of them for a weapon.

[DEFENSE]:      All right.  Okay.  Now, anybody that you searched did you have a warrant for them?

[SEXTON]:       No, sir.  I didn't go into their pockets.  I patted them down.

[DEFENSE]:      Okay.  Well, I mean, did you have--did you have--did you have any--did you have any reason to believe that anybody that you searched had a weapon?

[SEXTON]:       Well, sir, in my line of work you'd better assume that everybody you come across in--in that type of situation has a weapon, or you'll end up dead.

[DEFENSE]:      Okay.  So, you assume that everyone in the bar, in fact, was armed?

4

[SEXTON]: If that's the way you want to say it, yes, sir.

[DEFENSE]: Okay. And, in fact, of the people you searched how many were armed?

[SEXTON]: None.

[DEFENSE]: Okay.

[SEXTON]: A few--a couple of pocket knives like this gentleman said earlier.

[DEFENSE]: Okay. And pocket knives of a sort that you didn't feel that being . . .

[SEXTON]: No, sir.

[DEFENSE]: . . . any point in charging them with carrying a weapon . . .

[SEXTON]: No, sir.

[DEFENSE]: . . . or anything like that? You didn't have an arrest warrant for any of these people?

[SEXTON]: No, sir.

[DEFENSE]: All right. So--but, again, without regard to whether they are a law abiding citizen, or a law violator you put handcuffs on every single one of them?

[SEXTON]: Yes, sir.

[DEFENSE]: And everyone--everyone was--okay, you just patted down for weapons?

[SEXTON]: Yes, sir.

\*     \*     \*

[PROSECUTOR]: Okay. The court was mentioning the shock effect of someone coming in wearing that balaclava with a sub-machine gun in their hands. Is that something that plays any role in the training of a SWAT team, the shock effect?

5

[SEXTON]:        Yes, sir.  In the training that I have received when you approach someone whether, you know, maybe they have intentions of being violent if you can get that couple of seconds of shock to where that they have to set there [sic] and their brain has to process, do I fight or do I run, then in that time is when you're acting on them.  And that way it comes to a peaceful solution.  You don't give that time to pull the gun, or pull the trigger, or whatever.

[PROSECUTOR]:    And that's part of officer's safety isn't it?

[SEXTON]:        That's every bit a part of officer's safety.

                         *      *      *

[DEFENSE]:       Officer, this happened to be a bar called The Weed, but, I take it if you were called out to go to McDonald's with information that an employee there had sold drugs, and that he might have a gun you would go into McDonald's and execute the warrant to secure the area in exactly the same way, that's what your training is?

[SEXTON]:        Well, McDonald's does not stay open the same hours as a bar does, or . . .

[DEFENSE]:       Well . . .

[SEXTON]:        . . . and I believe, you know, that was probably part of the reason that this was executed the way it was.

[DEFENSE]:       But, if you were told to go to McDonald's that's the way you'd do it?  You'd put them on the floor and handcuff them?

[SEXTON]:        If I was--if I was told to, and I felt it was a legal arrest I would do it.

[DEFENSE]:       Okay.  That's all.

                         *      *      *

[DEFENSE]:       Did--did you all secure everybody before other members of the party came into the . . .

6

[SEXTON]:          Yes. When we make entry into any--any--whether it be a residence, or whether it be a public establishment, and we are taking custody of those people there, and if the guy that we don't have the search warrant on has a gun, and there's five other people there, we're responsible for those people to protect them from that one guy. So, yes, everyone was handcuffed.

[DEFENSE]:          Well, no, I--I mean, before--before the other officers came in . . .

[SEXTON]:          Yes. We secured it.

[DEFENSE]:          . . . you had everybody handcuffed?

[SEXTON]:          Yes, sir, everyone was secure.

                              *          *          *

[DEFENSE]:          So, if--your training tells you that if you're entering a--a legal establishment where there are patrons who are legally present, and for whom you have no information whatsoever that they're violating the law that you deal with that situation the same as you would deal with a--with a--a gang's headquarters where your information is that everyone there is a criminal and is armed and dangerous?

[SEXTON]:           No, sir, it's not the same.

[DEFENSE]:          Okay. Well, how--how--how--how would you treat these law abiding citizens, or how much worth would you treat [sic] those gang members? You come in . . .

[SEXTON]:          I will treat the gang member that steps off that bar stool, and gets in the floor, and obeys my command just as good as I'll treat any other citizens who--who obeys the command.

[DEFENSE]:          So--so, you are saying that you're going to do exactly the same thing. You're going--you're going to put the law abiding citizen on the ground just like you're going to put the--the known criminal on the ground?

7

[SEXTON]: In that situation because you're taking a six man team and you're into some place where you don't know how many people are there. You don't know who is armed, who is not armed, who has violent intentions, and who does not. So, you're--you're--you have a liability--you have an obligation to those people who are there obeying the law to--for their own safety to make sure that that other person doesn't hurt the . . .

[DEFENSE]: Okay.

[SEXTON]: . . . while . . .

[DEFENSE]: So, if--if a law abiding citizen is there in that situation if--if some citizen rather than getting on the ground as he was told to do just stood there and stared at you someone would put him on the ground?

[SEXTON]: He would be placed on the ground.

[DEFENSE]: And--and if he--and if he jerked back and said, who are you, what are you doing, whatever force was necessary to put him on the ground would be--would be utilized?

[SEXTON]: As the subject's level of resistance goes up our level of force has to go up.

[DEFENSE]: And so, and--and you're not going to sit there--it's not going to be a debate for five minutes either?

[SEXTON]: No, sir. In that situation you do not have time for debate.

[DEFENSE]: So--so, if this citizen just doesn't move as fast as the SWAT team members that accost him thinks he ought to do then that SWAT team member is authorized . . .

[PROSECUTOR]: Your Honor, I'm going to object to the use of the word accost. I think that shows a certain level of belligerence.

[DEFENSE]: Any word you want to use when he's approached.

[PROSECUTOR]: Confronts.

[DEFENSE]:        Confront, whatever.

[SEXTON]:         They're--they're placed on the ground using the minimal amount force necessary. They're--they're not thrown to the ground. They're not tackled, none of that.

[DEFENSE]:        But, if--if he--if he doesn't get on the ground quick enough somebody's going to put him on the ground?

[SEXTON]:         If a subject resists force is used against him to place him on the ground.

[DEFENSE]:        Well, if he just--he just--he just backs up, and he's saying, what's going on?

[SEXTON]:         That's resistance.

[DEFENSE]:        That's resistance, and you'll throw him on the ground?

[SEXTON]:         No, sir. Will not throw him on the ground. I'll place him on the ground.

[DEFENSE]:        Well . . .

[SEXTON]:         There's a difference. I could jump over this bench and tackle you, that's--that's throwing you on the ground. If I take you by the arm and lead you to the ground that's placing . . .

[DEFENSE]:        But I--I don't want to go?

[SEXTON]:         Well, I'd just use a little more force till you do go.

[DEFENSE]:        And--and--and if you can't get me down, and it takes three more then . . .

[SEXTON]:         I'll use as much force as it takes to . . .

[DEFENSE]:        Okay.

[SEXTON]:         . . . to stop the resistance and then the force will stop.

[DEFENSE]:        And, so, if--if it takes the entire SWAT team to get this 56 year old man down on the ground I'm going down?

[SEXTON]:          Yes, sir.

[DEFENSE]:         All right.

[SEXTON]:          If you're causing a threat.


Sergeant Kenneth Phillips testified that he was the director of the First Judicial District Drug Task Force and also present at the execution of the search warrant at Defendant's tavern. It was Phillips who had requested the SWAT team's involvement. He and the other DTF agents who conducted the search were outside the tavern when the SWAT team entered. Phillips clearly heard the SWAT team members screaming, "[S]heriff's department, get down; sheriff's department, get down," even over the loud music coming from the juke box. Phillips did not witness any injuries suffered by any patrons of the tavern. Nor did he observe any mistreatment of them by law enforcement officers. However, everyone inside the tavern prior to the SWAT team's entrance was "on the ground" by the time Phillips entered the premises. Phillips testified that Delsa Lee Holmes (who had previously testified in Defendant's behalf) was "highly intoxicated" but uninjured when he entered the tavern.

Bobby Daniels, a customer in the tavern when the search warrant was executed, testified that he was walking toward the bathroom at the time. He had just reached the juke box when the door "flung open" and he heard someone yelling, "[E]verybody get down. Everybody get down." Immediately thereafter, a man pushed Daniels 20 to 25 feet through the tavern and onto the floor. The man had a mask on his face and was holding a gun. Daniels' first thought was that a robbery was being committed. Daniels asked what was going on. The men told him to "shut his f---ing mouth" and pointed a shotgun in his face. When he was finally able to turn his head, he saw a badge on one of the men. Daniels was not charged with any criminal offense. Later, he was given a ride home by a woman who had not been drinking but was also a patron of the tavern that night.

Kelly Cally was sitting on the first bar stool in "The Weed" when the SWAT team entered. Cally testified that she was not at the bar long and had just sat down when she heard, "Get down, get down," accompanied by screaming and yelling. Men with black masks and guns threw her onto the floor; one of the men kept his foot on her lower back until she was handcuffed. A gun was also pointed at her head. The men then picked her up and seated her at a table. Later, she was arrested because the officers searched her purse and discovered a Percocet tablet.

Bobby Bishop, a mobile home park owner, was also present during the execution of the search warrant. Bishop testified that he had come to "The Weed" to pick up some documents from Defendant. Bishop explained that he and Defendant were involved in a civil lawsuit against the same man concerning real estate purchases they had made, and Bishop had stopped by to pick up the "survey papers." When the SWAT team entered, Bishop was seated at the sixth or seventh bar stool. He had not been drinking. He heard the door slam open and men screaming. A man with a mask and gun approached Bishop. He first told Bishop to get on the floor and then took him by the arm

and put him on the floor. Only 20 to 30 seconds elapsed from the time Bishop heard the door "crash" open to the point at which he was on the ground. When he reached the floor, he finally realized that the men who had forced him to the ground were police officers; he did not know who or what they were when they initially entered. Thereafter, Bishop was handcuffed, taken off the floor, and searched. He estimated that he remained handcuffed for approximately 20 to 30 minutes.

Also patronizing the tavern when the SWAT team arrived was Delsa Lee Holmes. Holmes testified that she heard the bar door open. She next observed "about five" men enter with black masks, goggles, and guns, "hollering to get down." Holmes was "stunned." According to Holmes, one of the men grabbed her by the hair and threw her down, off of the bar stool. Holmes claimed that her knee was hurt as a result, and her nose was "kind of busted." After she was handcuffed, one of the men informed her that they worked for the Washington County Sheriff's Department. She was then picked up off the floor and searched. In her purse, the officers discovered one Lortab tablet and one Valium tablet, both loose. The prescription bottles for these pills were also in the purse. She was nevertheless arrested on charges regarding the pills. The charges were subsequently dismissed. Holmes stated that she had been inside the bar for about forty-five minutes when the search began and denied that she had anything to drink. She also claimed that the officers failed to ask whether anyone was hurt but admitted that she did not report her injuries to anyone.

## ANALYSIS

The very narrow issue presented by the State's appeal is whether the law enforcement officers were required to "knock and announce" prior to entering Defendant's tavern to execute a valid search warrant. From the record it is clear that the officers designated to actually conduct the search pursuant to the search warrant did not include any of the SWAT team members. According to the SWAT commander, the SWAT team was to secure the area *prior* to execution of the search warrant by members of the DTF. The SWAT team secured the interior of the building by stunning and immobilizing each person present. The team accomplished this by forcing the people in the tavern to the floor and handcuffing them. Then the officers responsible for conducting the search entered the premises to conduct the search pursuant to the search warrant. The SWAT team's mission was limited to providing assistance to the other officers in the execution of the search warrant.

Since the search warrant was not made an exhibit, we can only surmise from the indictment that the officers involved discovered drugs and paraphernalia on Defendant's premises. Count 2 of indictment no. 26213 alleges that on April 28, 2000, Defendant possessed with intent to sell or deliver 5.2 grams of a Schedule II controlled substance, without identifying the substance. Count 3 of the same indictment alleges that on April 28, 2000, Defendant possessed drug paraphernalia consisting of electronic scales, inositol powder, and a small spoon with white residue.

The trial court granted Defendant's Motion to Suppress because the failure of the officers to "knock and announce" violated the provisions of Rule 41(e) of Tennessee's Rules of Criminal Procedure, which provides:

(e) Authority to Break In. If after notice of authority and purpose a peace officer *is not granted admittance*, or in the absence of anyone with authority to grant admittance, a peace officer with a search warrant may break open any door or window of a *building* or *vehicle*, or any part thereof, *described to be searched in the warrant* to the extent that it is reasonably necessary to execute the warrant and does not unnecessarily damage the property.

Tenn. R. Crim. P. 41(e) (emphasis added).

The standard for our review of the trial court's findings of fact and conclusions of law on Defendant's motion to suppress evidence is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). This Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

The State correctly recognizes in its brief that the United States Supreme Court has concluded that the common law "knock and announce" procedure is a factor to consider in assessing the reasonableness of a search or seizure under the Fourth Amendment. Wilson v. Arkansas, 514 U.S. 927, 933-34, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). The "knock and announce" requirement is not without exception, when exigent circumstances exist. In Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), the Supreme Court held:

In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

Id. at 394.

While not afforded the same heightened protection as a residential dwelling, commercial premises are protected by the Fourth Amendment's prohibition on unreasonable searches and seizures. New York v. Burger, 482 U.S. 691, 699, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601, 612 (1987).

The failure to comply with the provisions of Tenn. R. Crim. P. 41(e), absent exigent circumstances, "results in the exclusion of any evidence seized under color of the [search] warrant." State v. Curtis, 964 S.W.2d 604, 609 (Tenn. Crim. App. 1997). In its ruling from the bench, and on

the record, the trial court found that no exigent circumstances existed justifying noncompliance with Rule 41(e)'s "knock and announce" requirement. Our court in Curtis explained what 41(e) requires:

> [A] law enforcement officer who is charged with the execution of a search warrant must give (a) notice of his authority (i.e., he is a police officer, a deputy sheriff, or an agent of the Tennessee Bureau of Investigation) and (b) the purpose of his presence at the structure to be searched (i.e., the execution of a search warrant, before making a <u>forced</u> <u>entry</u> into the structure).

Curtis, 964 S.W.2d at 609 (citations omitted) (emphasis added).

We conclude that the language of Rule 41(e) clearly does not limit the meaning of the word "building" to include only residential dwellings. Again, the rule states that the officer is authorized to "break open any door or window of a building or vehicle, or any part thereof, described to be searched in the warrant." Tenn. R. Crim. P. 41(e). Indeed, without any circumscriptions in the rule, the word naturally encompasses *any* building, whether a residence, retail commercial premises, tavern, storage building, or any other structure. Moreover, as noted by our court in Curtis, the Rule 41(e) "knock and announce" requirement contemplates a procedure to be utilized prior to a *forced* entry into a structure. Defendant's tavern was open to the public at the time the search warrant was executed. Officers could have walked lawfully through the door into the open area of the tavern without a search warrant. In other words, Defendant can claim no reasonable expectation of privacy in the area the SWAT team members entered to "secure" each customer prior to the execution of the warrant. (We expressly do not rule on the expectation of privacy of any of the customers who were "protected" and "secured" by the SWAT team.) In sum, we conclude that the "knock and announce" requirement in Rule 41(e) pertains to any building, but it is also limited to only those buildings where police officers have no right to be, absent the issuance of a valid search warrant.

Under the facts of this case, we consider the conduct of the SWAT team to be dangerous and an unduly frightening experience for the several innocent persons present. We agree with the trial court that no exigent circumstances existed to excuse noncompliance with the "knock and announce" requirement, if Rule 41(e) had been applicable. We further observe that the trial court concluded that law enforcement's suspicion that Defendant was armed was nothing more than a "hunch." The proof does not preponderate against this finding, and we note that the record is also devoid of proof that anyone else present in the tavern during the raid was armed. We are concerned, along with the trial court, about the inherent danger to officers and the innocent bystanders alike when methods of the type employed by the SWAT team in this instance are utilized. Clearly, the judgment of law enforcement concerning the necessity for "shock force" tactics in this case is suspect. We speculate that, given a choice, innocent customers of a business establishment would overwhelmingly opt to forgo "protection," rather than have it provided in such a manner. Nevertheless, the law compels us to reverse the judgment of the trial court. There was no requirement for the officers to "knock and announce" prior to entering Defendant's tavern.

13

## CONCLUSION

For the foregoing reasons, the trial court's order granting Defendant's Motion to Suppress is reversed, and this case is remanded to the trial court for further proceedings. In our discretion, we tax costs to the State.

_____

THOMAS T. WOODALL, JUDGE