JAJBAR, J.,
dissenting.
[¶ 27] I respectfully dissent because the joint operation of the Commercial Motor Vehicle Unit of the Maine State Police (Commercial Vehicle Unit) and the Drug Enforcement Agency (DEA) had the primary purpose of interdicting drugs. This joint operation exploited the Commercial Vehicle Unit’s authority to conduct safety inspections as a pretext to detect ordinary criminal activity.
[¶ 28] The suspicionless sweep of buses in interstate travel is a common police tactic in the “war on drugs” known as “working the buses.”[9] Generally, the tactic involves law enforcement officers boarding interstate buses at stopovers, identifying themselves, announcing their purpose to locate drug traffickers, and requesting consent to search passengers’ belongings without any prior suspicion of criminal wrongdoing. See Florida v. Bostick, 501 U.S. 429, 440-42, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (Marshall, J., dissenting). The Bostick Court held that the police are permitted to conduct these searches without a warrant pursuant to the passengers’ consent, if the “officers do *380 not convey a message that compliance with their requests is required.” Id. at 437, 111 S.Ct. 2382 (majority opinion). Following the Bostick decision, there has been substantial academic criticism of this law enforcement technique. See, e.g., Tracey Maclin, Justice Thurgood Marshall: Taking the Fourth Amendment Seriously, 77 Cornell L.Rev. 723, 800-01 (1992); Christian J. Rowley, Florida v. Bostick: The Fourth Amendment-Another Casualty of the War on Drugs, 1992 Utah L.Rev. 601, 626-45; Shawn V. Lewis, Fourth Amendment-Protection Against Unreasonable Seizures of the Person: the Intrusiveness of Dragnet Styled Drug Sweeps, 82 J.Crim. L. & Criminology 797, 797-98, 816 (1992).
[¶ 29] Notwithstanding the controversy surrounding the law enforcement tactic at issue in this case, unlike the facts in Bostick, here we have the added role of a pretextual safety inspection. Cf. Bostick, 501 U.S. at 431-32, 111 S.Ct. 2382. If the DEA agents were working independently of the Commercial Vehicle Unit and had merely engaged Ntim in “consensual conversation[s]” in the terminal, see Court’s Opinion ¶ 17, then Florida v. Bostick would control this case, and I would agree with the Court’s decision to affirm. See Court’s Opinion ¶¶ 18, 20. However, we cannot ignore the cooperation and coordination between the Commercial Vehicle Unit and DEA agents in this joint operation. DEA Agent Wolf said it best when he testified that “[it was] a planned operation to work with the Maine State Police [Commercial Vehicle Unit]. They were conducting safety inspections on buses, and we had an existing relationship with them through which those safety inspections offered an opportunity for us to work on interdiction.” (Emphasis added.) Because the investigating officers sought Ntim’s consent for a search only after they confronted him with evidence gathered in an unlawful search of his luggage, this case crosses the line drawn by the Bostick Court. See 501 U.S. at 437, 111 S.Ct. 2382.
A. Safety Inspection
[¶ 30] Although the Court assumes that the bus inspection was unlawful, believing that the record was undeveloped in that regard, Court’s Opinion ¶ 10, I provide a full analysis of the bus inspection because it is necessary for a clear understanding of the connection between the actions of the DEA agents and officers of the Commercial Vehicle Unit.
1. Special Needs Requirement
[¶ 31] In order to conduct suspicionless and warrantless inspections, the Fourth Amendment clearly requires the police to demonstrate that they have a special law enforcement need, distinct from a “general interest in crime control.” See City of Indianapolis v. Edmond, 531 U.S. 32, 40-41, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (emphasis added and quotation marks omitted); State v. Johnson, 2009 ME 6, ¶¶ 14-16, 962 A.2d 973. This special law enforcement need ensures that police are not simply circumventing the Fourth Amendment requirements in ordinary criminal investigations and “preventfs] arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.” See United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); see also Edmond, 531 U.S. at 41, 121 S.Ct. 447; Nat’l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665-68, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). For example, the Supreme Court has held that the police may conduct special needs investigations where the public interest outweighs the degree of intrusion on the individual’s Fourth Amendment interest— specifically for the detection of drunk driv *381 ers, Mich. Dep’t of State Police v. Sitz, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), and illegal aliens, Martinez-Fuerte, 428 U.S. at 566, 96 S.Ct. 3074.
[¶ 82] In City of Indianapolis v. Edmond, the U.S. Supreme Court addressed a similar inspection using a drug-sniffing dog conducted for the sole purpose of detecting illegal narcotics. 531 U.S. at 35, 40-41, 121 S.Ct. 447. The Government argued that the use of the drug dog was a limited intrusion on the individual’s Fourth Amendment privacy interests as weighed against the public’s substantial interest in curbing narcotics trafficking. Id. at 42-43, 121 S.Ct. 447. The Edmond Court rejected this argument and held that the checkpoint was unconstitutional solely based on the program’s primary purpose — detecting ordinary criminal activity. Id. at 43-44, 121 S.Ct. 447 (“We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes.”, (emphasis added)). In Edmond, the Court did not focus on the limited intrusion of the drug dog, but viewed the use of a drug dog as evidence of the primary purpose of the inspection — detecting illegal narcotics. Id.
[¶ 33] Similarly, an administrative safety inspection may not be conducted primarily for detecting ordinary criminal activity. “In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations.” New York v. Burger, 482 U.S. 691, 724, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (Brennan, J., dissenting) (citing, inter alia, Michigan v. Clifford, 464 U.S. 287, 292, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984); Michigan v. Tyler, 436 U.S. 499, 508, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); Donovan v. Dewey, 452 U.S. 594, 598 n. 6, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); Camara v. Mun. Ct. of San Francisco, 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)); see also Abel v. United States, 362 U.S. 217, 226, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (“The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts.”). To determine whether the safety inspection was conducted to detect ordinary criminal activity, we examine the intent of the investigating officers.
2. Intent of the Investigating Officers
[¶ 34] Generally, safety inspections of commercial motor vehicles in interstate travel are permitted without a warrant or prior suspicion. See State v. Melvin, 2008 ME 118, ¶ 7, 955 A.2d 245. However, to determine whether the primary purpose of a purported administrative safety inspection is actually for general criminal investigation, we examine the subjective intent of the investigating officers. See Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2080-81, 179 L.Ed.2d 1149 (2011). Although we have observed in some Fourth Amendment cases that the subjective intentions of individual officers are irrelevant, see State v. Cilley, 1998 ME 34, ¶ 7, 707 A.2d 79, searches conducted for administrative purposes or pursuant to a special law enforcement need are longstanding exceptions to that rule. See al-Kidd, 131 S.Ct. at 2080 (“Fourth Amendment reasonableness is predominately an objective inquiry .... Two limited exceptions to this rule are our special-needs and administrative-search cases, where actual motivations do matter.” (quotation marks and alterations omitted)).
[¶ 35] An inspection is pretextual when investigating officers use their legal authority to conduct administrative inspec *382 tions in order to gain access to persons or places absent a warrant or prior suspicion in order to conduct ordinary law enforcement investigations. See Whren v. United States, 517 U.S. 806, 811, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (quoting Burger, 482 U.S. at 716-17 & n. 27, 107 S.Ct. 2636); cf. Johnson, 2009 ME 6, ¶¶ 14-16, 962 A.2d 973. When the officers conduct a pretex-tual administrative inspection, their actions are “invalid ab initio and our analysis ... end[s] there.” See Johnson, 2009 ME 6, ¶¶ 14-16, 962 A.2d 973.
[¶ 36] Here, the pretext is obvious— the officers of both the Commercial Vehicle Unit and the DEA actually intended to conduct a joint investigation to detect the trafficking of illegal narcotics. The Commercial Vehicle Unit conducted the safety inspection and the lead investigator of that unit clarified the intent of the operation at the suppression hearing:
Defense: Okay. You just indicated that there was an exterior walk around, looking at the lights — (indiscernible). And the [canine] what — what—what is the [canine] intended to detect on the bus when you’re doing an inspection?
Lieutenant Currie: Drugs.
Defense: For a safety inspection?
Lieutenant Currie: Yes.
Defense: Okay. So that is part of the primary objective then?
Lieutenant Currie: Well, it’s an additional portion of it. It’s part of our job to inspect commercial vehicles and to interdict crime.
(Emphasis added.) Further, the drug dog handler in the Commercial Vehicle Unit testified:
Sergeant Bergquist: There’s part of any commercial inspection under the federal regulations is [sic] to check for the presence of drugs or alcohol. There’s also a history of large amounts of narcotics being transported under the disguise of commercial commerce. Prosecution: So if you were doing any commercial motor vehicle check, you would use your dog?
Sergeant Bergquist: Correct.
[¶ 37] Although the regulations prohibit drivers from possessing narcotics or other substances “which renderf] the driver incapable of safely operating a motor vehicle,” 49 C.F.R. § 392.4(a) (2012), they contain no provision authorizing the inspection of passengers or their personal belongings for drugs. See generally 29-A M.R.S. § 555(2) (2012) (permitting the adoption of the Federal Motor Carrier Safety Regulations); V-1 Oil Co. v. Means, 94 F.3d 1420, 1427 (10th Cir.1996) (“The [motor carrier safety] regulations make it clear the inspections are limited in scope to safety concerns. They do not authorize a general search by any law enforcement officer.” (citation omitted)).
[¶ 38] When the officers of the Commercial Vehicle Unit stepped foot on the bus under the guise of a safety inspection with the clear intention to look for drugs, they violated the Fourth Amendment. See, e.g., al-Kidd, 131 S.Ct. at 2080-81; Whren, 517 U.S. at 811-12, 116 S.Ct. 1769. The Commercial Vehicle Unit’s use of a drug dog is evidence of their intent not to conduct a safety inspection, but to interdict drugs. Further, the officers clearly testified that they conducted the inspection for the purpose of inspecting passengers’ luggage for drugs, which compels me to conclude that the primary purpose was a general interest in crime control, and thus the inspection violates the Fourth Amendment.
B. DEA Actions
[¶ 39] Further, the evidence in the record compels me to conclude that the Fourth Amendment violation was not sim *383 ply confined to the bus inspection but also extends to the actions of the DEA agents for three reasons.
[¶ 40] First, based on Ntim’s failure to move the suppression court for additional findings of fact or conclusions of law, the Court infers that the trial court found that Ntim’s consent was the result of a separate lawful investigation and was thus attenuated from the illegal bus inspection. See Court’s Opinion ¶¶ 10 & n.3, 18. “[W]e will infer that the court found all the facts necessary to support its judgment if those inferred findings are supportable by evidence in the record.” State v. Connor, 2009 ME 91, ¶ 9, 977 A.2d 1003; see generally U.C.D.R.P.-Cumberland County 41A(d); M.R.Crim. P. 41A(d). However, as the Court noted, the trial court never addressed the issue of whether the bus inspection was lawful, Court’s Opinion ¶ 10 & n.3, and thus it had no reason to determine whether Ntim’s consent was attenuated from that illegality. See State v. Boyington, 1998 ME 163, ¶ 9, 714 A.2d 141. But see Court’s Opinion ¶ 10 & n.3 (noting that “[t]he [trial] court also accurately concluded that the drug enforcement agents’ actions in the terminal ... led to the discovery of cocaine on Ntim”). Thus, the Court in this case infers a finding to support a conclusion that the trial court never made — that Ntim’s consent was attenuated from the fruits of an illegal bus inspection.
[¶41] Rather, during the suppression hearing, the trial court stated that the police “[we]re checking to make sure as to who’s coming into the state, and they have an absolute right to do that under these circumstances.” (Emphasis added.) Because the trial court would have had no reason to engage in an attenuation analysis pursuant to State v. Boyington, 1998 ME 163, ¶ 9, 714 A.2d 141, any inference that the trial court might have considered whether Ntim’s consent was a result of the bus inspection or of separate investigative activities by DEA agents is wholly invented on appeal.
[¶ 42] Second, the evidence in the record does not support the Court’s inference that the drug dog handler approached Ntim due to the separate, lawful investigative activities of the DEA agents. See Connor, 2009 ME 91, ¶ 9, 977 A.2d 1003 (stating that we will infer that the trial court made findings if those findings are “supportable by evidence in the record”). DEA Agents Wolfe and Brown both testified that they did not request the drug dog handler to approach Ntim with the drug dog. Agent Wolfe testified, “I did not, specifically, say ‘I’m interviewing this person now[, c]ome examine them,’ no. It happened without my prompting.” (Emphasis added.) Similarly, Agent Brown stated that he did not know if someone requested Sergeant Bergquist to bring the dog to Ntim and that he “did not hear anybody specifically [request it].”
[¶43] Sergeant Bergquist, the Commercial Vehicle Unit’s drug dog handler, testified that it was “not a normal part of an inspection of a bus” to lead the dog through the terminal, but that he led the dog into the terminal in this case as “a follow up to the [drug dog’s] indication [on luggage] inside the bus.” However, before he could begin his follow-up inspection in the terminal, Bergquist testified that one of the DEA agents requested him to lead the dog to Ntim.[10] The trial court did not *384 specifically find that the DEA agent’s request for a sniff of Ntim was unrelated to the bus inspection. Instead, the trial court found that “[t]he state police dog comes off the bus, after having hit twice in regard to the Defendant’s luggage, [where] they found some green plant material residue. And he comes out and he ... inquired if it was [alright] if he could go ahead and bring the dog [to sniff Ntim].”
[¶ 44] Regardless of whether the Commercial Vehicle Unit’s drug-dog handler approached Ntim due to the bus inspection or the DEA agents’ investigation, it is undisputed that the DEA agents confronted Ntim with the evidence produced by the drug dog before they requested his consent to a search of his person. DEA Agent Wolfe stated to Ntim, “Look, here’s what we have. Here’s all the things that are indicating and making me suspicious.” (Emphasis added.) Agent Wolfe, who “requested” Ntim’s consent, testified that he informed Ntim
Here’s what’s going to happen for the next while. I’m concerned that you. have drugs right now. And in order to do my job of trying to keep drugs out of the community, what may happen next is we may move forward and detain you. We can seek a search warrant. We can do a lot of things, and it might mean that you’d have to go later on. Or if [you are] not carrying anything, and you tell me that you’re not carrying anything, we can be done with this very quickly, if you’ll just let us make sure that you don’t have anything on you.
Agent Brown corroborated this testimony, stating, “Special Agent Wolfe had presented what had arisen thus far with the dog [, and t]hen he had asked him if he would consent to a search of his person.” Although Agent Wolfe requested Ntim’s consent for a search, he noted, “[Ntim] wasn’t free to go based on everything that I knew.” This is not the result of an independent investigation by DEA agents conducting a “consensual conversation.” But see Court’s Opinion ¶ 17. The notion that DEA agents coordinating a joint operation and maintaining constant communication with the Commercial Vehicle Unit — who had inspected the bus and had only moments before found incriminating evidence in a bag belonging to Ntim — approached Ntim due to a wholly separate, simultaneous investigation is simply not supported by the evidence in this record.
[¶ 45] Third, the Court determines that the actions of the DEA agents were separate from the Commercial Vehicle Unit because it concludes that Ntim would have “ended up in the terminal, exposed to law enforcement, regardless of whether or not Angel was brought in to sweep the bus.” Court’s Opinion ¶ 16. The Court defers to the trial court’s finding that inspection of the onboard restrooms was a legitimate reason to ask passengers to exit the bus. However, the trial court’s factual finding is not supported by any competent evidence in the record, and it is therefore clearly erroneous. See State v. Bartlett, 661 A.2d 1107,1108 (Me.1995).
[¶ 46] The regulation governing the inspection of onboard restrooms reads: “Each bus (except in commuter service) seating more than 14 passengers (not including the driver) shall have a clean, regularly maintained restroom, free of offensive odor. A bus may be operated without a restroom if it makes reasonable rest stops.” 49 C.F.R. § 374.813(b) (2012). Common sense dictates that it is unnecessary to have the twenty-five passengers aboard the bus vacate the bus in order for an officer to ensure that the restroom is clean and odor free. See id. There is no *385 further evidence in the record that removing passengers from the bus was necessary to carry out this kind of inspection of the restroom.
[¶ 47] Rather, Sergeant Bergquist, the drug dog handler, testified that passengers were asked to exit the bus so that he could “[take] Angel off of her lead and let her have free reign [sic] of the bus.” Most compelling, however, is the testimony of DEA Agent Paul Wolfe, who testified that the Commercial Vehicle Unit and the DEA agents planned to target “a specific bus” traveling from New York City to Portland for a safety inspection and that DEA agents would approach the passengers who exited that bus. DEA Agent Wolfe further testified that both the Commercial Vehicle Unit and the DEA jointly formed an “initial plan in the morning ... to examine bags” — a plan that could only be carried out if passengers exited the bus, left their luggage on board, and gave the drug dog free access to the bags. Further, Lieutenant Currie testified that before he conducted the safety inspection, he told the driver to instruct the passengers to leave their bags onboard and exit the bus. Therefore, the trial court’s finding that inspection of the restrooms was a “legitimate reason” to ask passengers to exit the bus is clearly erroneous. See State v. Bailey, 2012 ME 55, ¶ 12, 41 A.3d 535; Bartlett, 661 A.2d at 1108 (setting out the clearly erroneous standard of review).
[¶ 48] In sum, although the trial court failed to consider the relationship between the actions of the Commercial Vehicle Unit and the actions of the DEA agents in the terminal, the evidence in the record compels both a finding and a conclusion that their actions were connected. I agree with the Court’s assertion that if the DEA agents were working independently of the Commercial Vehicle Unit, then Florida v. Bostick applies and the DEA agents are allowed to question passengers in the terminal just as they would be on the bus. See 501 U.S. at 435-37, 111 S.Ct. 2382. But the facts are dramatically different in this case because the actions of the DEA agents and the Commercial Vehicle Unit in this joint operation were planned and coordinated. Agent Wolfe testified that the safety inspections generally “offered [the DEA agents] an opportunity ... to work on interdiction,” and that the “initial plan in the morning ... was to examine bags.” Agent Wolfe elaborated that the DEA agents and the Commercial Vehicle Unit worked “in concert” regularly, they had “done this several times ... [in] Portland, Lewiston, Augusta, a variety of places.”
[¶ 49] Both the Commercial Vehicle Unit and the DEA planned to have all of the passengers, including Ntim, removed from the bus, leaving their luggage on-board, so that the Commercial Vehicle Unit’s drug dog could examine their luggage and the DEA agents could question them in the terminal. DEA agents requested Ntim’s consent only after the Commercial Vehicle Unit brought their drug dog to sniff his person — which was only moments after the Commercial Vehicle Unit located trace evidence of drugs in Ntim’s bag. They confronted Ntim with this evidence before “requesting” his consent.
C. Conclusion
[¶ 50] Given this overwhelming evidence on the level of communication and coordination between these two agencies, any implicit finding that the encounter in the terminal was unrelated to the bus inspection is clearly erroneous. The uncon-troverted evidence in this case compels a conclusion that the officers of the Commercial Vehicle Unit and the DEA agents jointly planned the encounter and coordinated their actions to allow DEA Agents to *386 question the passengers whom the inspecting officers removed from the bus, and that the DEA agents confronted Ntim with the fruits of the unlawful bus inspection. I would vacate the judgment denying Ntim’s motion to suppress the evidence gathered in the search of his person.

. The term "working the buses” was used by the Florida Supreme Court and later by the United States Supreme Court in Florida v. Bostick. See Florida v. Bostick, 501 U.S. 429, 433, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Bostick v. State, 554 So.2d 1153, 1156 (Fla.1989) overruled by Bostick, 501 U.S. at 440, 111 S.Ct. 2382, 115 L.Ed.2d 389.

. Although the drug dog handler did not indicate that he knew the agent who requested a sniff of Ntim was from the DEA, he stated that the officer was in plain clothes— which DEA agents wore on the morning of Ntim’s arrest — and that the officer had found Ntim’s name "in one of [their] indexes.” The DEA agents testified that they had in fact located Ntim’s name as a person of interest in *384 their Narcotics and Dangerous Drugs Information System.