J-S46027-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SANDRA ROMAN | : | |
| | : | |
| Appellant | : | No. 76 EDA 2019 |

Appeal from the Judgment of Sentence Entered November 30, 2018
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-SA-0000282-2017

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

DISSENTING MEMORANDUM BY OLSON, J.:          **FILED JUNE 23, 2020**

I respectfully dissent.  Unlike my learned colleagues, I believe that the police, under the pretext of an administrative search pursuant to 75 Pa.C.S.A. § 6308, conducted a warrantless criminal search under circumstances that would not excuse the warrant requirement.  Hence, as suppression was warranted, I would hold that Appellant, Sandra Roman, is entitled to relief.

Both the Pennsylvania Constitution and the United States Constitution express a preference for searches conducted pursuant to a warrant and that warrantless searches survive constitutional scrutiny only in limited circumstances.  Our Supreme Court has determined:

> Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution generally prohibit

---

[*] Retired Senior Judge assigned to the Superior Court.

the police from searching a person or his or her property and seizing personal items without a search warrant. A search warrant indicates that the police have convinced a neutral magistrate upon a showing of probable cause, which is a reasonable belief, based on the surrounding facts and totality of circumstances, that an illegal activity is occurring or evidence of a crime is present. A search without a warrant may be proper where an exception applies and the police have probable cause to believe a crime has been or is being committed. Even absent probable cause, some searches without warrants do not violate state or federal constitutional privacy rights.

*Commonwealth v. Petroll*, 738 A.2d 993, 998-999 (Pa. 1999).

Administrative searches, some of which may be conducted on the premises of businesses subject to continuing government oversight and comprehensive regulatory surveillance, constitute an exception to the warrant requirement. In **Petroll**, our Supreme Court observed,

While it is well established that the police must possess probable cause to search a business premise when there is suspicion of illegal activity, an administrative search does not always require a showing of probable cause. An owner of a business may not enjoy an expectation of privacy equal to that of a personal residence. In the name of protecting the public's welfare, the government often weaves an intricate web of regulatory scrutiny. Some industries have such a true history of government oversight that owners of those closely regulated businesses should have little or no expectation of privacy. Depending on the statutory scheme, owners of certain closely regulated businesses should expect that their businesses would be subject to warrantless administrative searches.

\*          \*          \*

Courts should treat a business as closely regulated, if the statutes and regulations governing it are sufficiently comprehensive and defined, so that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

*Id.* at 1000–1001 (internal citations, quotations, and brackets omitted). Automobile salvage yards, repair shops, and businesses engaged in used car sales are closely regulated industries. *See id.* at 1001, *citing* **New York v. Burger**, 482 U.S. 691 (1987); *see also Commonwealth v. Hudak*, 710 A.2d 1213 (Pa. Super. 1998).

Within the context of automotive sales, salvage, and repair enterprises, police officers may conduct investigations under 75 Pa.C.S.A. § 6308, which provides, in pertinent part:

> **(c) Inspection.**--Any police officer or authorized department employee may, during business hours or at any other time in which work is being conducted or work is being performed, inspect any vehicle, or major component part for which records are required to be kept under subsection (d), in any garage or repair shop or on the premises of any dealer, miscellaneous motor vehicle business, salvage motor vehicle auction or pool operator, salvor, scrap metal processor, or other public place of business which deals in the trade of vehicles or major component parts for the purpose of:
>
>> (1) locating stolen vehicles or parts of vehicles or major component parts with identification numbers, Federal certification labels, anti-theft labels or parts stickers removed, altered or falsified; or
>>
>> (2) inspecting the records required to be kept under subsection (d).
>
> The owner, operator, representative of the owner or operator of the business or other person shall permit any police officer or authorized department employee to make investigations under this subsection.
>
> **(d) Records.**--
>
>> (1) Every salvor, miscellaneous motor vehicle business, salvage motor vehicle auction or pool operator, scrap metal processor, garage, repair shop and dealer shall keep accurate records of the purchase, acquisition, sale and

disposition of vehicles as required under sections 1103.1 (relating to application for certificate of title), 1111 (relating to transfer of ownership of vehicle), 1113 (relating to transfer to or from manufacturer or dealer), 1114 (relating to transfer of vehicle by operation of law), 1119 (relating to application for certificate of title by agent), 1161 (relating to certificate of salvage required), 1162 (relating to transfer to vehicle salvage dealer), 1163 (relating to transfer to scrap metal processor) and 1164 (relating to theft vehicles). The records shall also include a corresponding customer receipt with the vehicle identification number, make, year and type of vehicle, from whom the vehicle was purchased or acquired, sold to or disposed of, the date, location and place purchased, acquired, sold or disposed of and the amount paid or other tender exchanged for the purchase, acquisition, sale or disposition.

(2) The records shall also include a photocopy of a government-issued form of photo identification from the person towing or selling the vehicle, driver's license number and location from where the vehicle was towed or sold and the business name, address, license number and contact number of the towing company.

(3) The records shall be available on the premises of the salvor, miscellaneous motor vehicle business, salvage motor vehicle auction or pool operator, scrap metal processor, garage, repair shop and dealer and open to inspection by any police officer or authorized department employee. The records shall be maintained for three years from the date of disposition of the vehicle.

(4) If inspection under subsection (c) reveals stolen vehicles, stolen major component parts, vehicles or major component parts with identification numbers, Federal certification labels, anti-theft labels or parts stickers removed, altered or falsified, any police officer or authorized department employee may seize those vehicles or vehicle parts, records relating to the seized vehicles or vehicle parts and the business, including proof of ownership or operation of the business, as well as any instrumentalities used to facilitate criminal activity.

75 Pa.C.S.A. § 6308(c)-(d). However, "[t]he police cannot conduct a warrantless administrative search to advance a criminal investigation under the pretext of addressing a specific, compelling governmental interest advanced by a statutory scheme." *Petroll*, 738 A.2d at 1003–1004, *citing Hudak*, 710 A.2d at 1217; *Commonwealth v. Slaton*, 608 A.2d 5, 8 (Pa. 1992).

I believe that our decision in *Hudak* and our Supreme Court's decision in *Slaton* are dispositive. In *Hudak*,

> [o]n December 1, 1995, Sgt. Dale Provins and Officer Jeffrey Judd of the Borough of Jefferson Police Department went to Bob's Auto Body in West Elizabeth to inspect records, documents and vehicles at that location to determine whether the vehicles were legally on the premises and properly owned by [Hudak]. Upon arriving at the location, Sgt. Provins approached [Hudak], the owner of Bob's Auto Body, and informed him that he was there for the purpose of checking vehicle information. Sgt. Provins expressly informed [Hudak] that they had received a tip that [Hudak] was dealing in "hot" auto parts. At that time, Sgt. Provins was carrying a copy of the Vehicle Code and advised appellant that under 75 Pa.C.S.A. § 6308(c), [Hudak] was required to allow the officers to inspect the premises. [Hudak] permitted the police to inspect Bob's Auto Body without a warrant.

*Hudak*, 710 A.2d at 1215. Upon inspection of all the vehicles at the auto body shop, the police found a vehicle with a Vehicle Identification Number (VIN) that "had been removed from another vehicle and had been glued on top of the original VIN number." *Id.* The Commonwealth subsequently charged Hudak with receiving stolen property, removing and falsifying identification numbers, and dealing in vehicles with falsified numbers. Prior

to trial, Hudak filed a suppression motion, which the trial court denied.  Upon review, we reversed, finding:

> [T]he record indicate[d] that the officers used their authority under § 6308(c) as a pretext to gather evidence of criminal activity.  From the beginning, the officers stated that their purpose for inspecting Bob's Auto Body was to follow up on reports of suspected criminal activity occurring there.  In fact, Sgt. Provins testified that "I was there for the purpose of checking information that we received that [Hudak's] business had been involved in dealing hot auto parts." N.T. 1/13/97 p. 4.  Moreover, the record [did] not reveal that the inspection of Bob's Auto Body was part of the routine enforcement of the regulatory scheme.  Accordingly, we [found] that 75 Pa.C.S.A. § 6308(c) [was] inapplicable because the December 1, 1995 search was not a routine inspection, and, therefore, the general Fourth Amendment warrant requirements appl[ied].  **See Slaton** (where officers intend to conduct a search for evidence, they must either obtain a warrant or assert an exception to the warrant requirement).

**Id.** at 1217.

In **Hudak**, we relied heavily upon our Supreme Court's prior decision in **Slaton**.  In **Slaton**,

> [o]n November 21, 1983, Narcotics Agent, Eugene C. Beard, Jr., went to Lou's Pharmacy to conduct an investigation of a suspect by the name of Merriweather, whom the agent believed to be forging prescriptions.  The agent identified himself, stated his purpose, requested the right to inspect the Schedule II records of the proprietor, Louis Slaton, and obtained [Slaton's] permission to do so.  While conducting this initial investigation, the agent "found a lot of forged prescriptions," none of which related to Merriweather, the subject of that investigation.  As a result of these initial findings the agent began contacting physicians to ascertain whether they had in fact issued and signed the prescriptions in question.
>
> Prior to returning to Lou's Pharmacy on December 6, 1983, the agent was aware that the prescriptions previously removed from Lou's Pharmacy's Schedule II files were forgeries.  The focus of the investigation had then shifted to Slaton.  Yet, neither Agent Beard nor Agent Infantino, who conducted the inspections on

December 6 and 7, 1983, indicated their suspicions or change of focus to [Slaton] until January 16, 1985. On the latter date, the agents obtained a search warrant for Lou's Pharmacy, conducted a search, and arrested Slaton.

*Slaton*, 608 A.2d at 6.

Ultimately, the *Slaton* Court concluded:

[T]he narcotics agents' only purpose in searching Slaton's pharmacy was to investigate alleged [criminal] activity. This was true even when the first search was conducted. The agents never claimed to have any administrative purpose but instead, declared at the outset that their desire was to gather additional information for an ongoing criminal investigation whose subject at that time was someone other than Slaton. The search, therefore, was not an administrative inspection conducted [] on a regular basis, but a discretionary act by officials who were involved in an ongoing criminal investigation. Since it was never claimed that the searches were administrative, the question of the parameters of an administrative search is not relevant here. The traditional Fourth Amendment warrant requirements for a valid search, therefore, apply in this case.

*Id.* at 8.

Here, the trial court found that Section 6308 authorized Trooper Rode to inspect title documents and records and he did so during normal business hours as statutorily required. Trial Court Opinion, 2/27/2018, at 20. The trial court found Trooper Rode's testimony at the suppression hearing credible insofar as he stated that he went to A to Z Auto to investigate a case that involved the failure to receive title to a motor vehicle, but then performed an inspection of all of title documents at the facility pursuant to his personal policy. *Id.* at 2-3. In addition, the trial court determined that "when all of the provisions of the PennDot [a]greement are read together, A to Z Auto and its manager, Appellant, are obligated to maintain records related to title

documents and have such documents available for inspection by the Pennsylvania State Police." *Id.* at 19. For the reasons that follow, I would hold that the trial court erred as a matter of law.

The trial court found that Trooper Rode initially responded to A to Z Auto to investigate a potential crime after an individual reported that he did not receive title to a vehicle processed by A to Z Auto. This was a dispositive assessment. In *Hudak*, this Court held that where the police responded to an automotive business to investigate a possible crime, the inspection did not involve routine enforcement of the regulatory scheme and 75 Pa.C.S.A. § 6308(c) did not apply. *See Hudak, supra*. In such circumstances, traditional, Fourth Amendment warrant requirements must be satisfied. *See Hudak*, 710 A.2d at 1215 (where an administrative search is not a routine inspection, the general Fourth Amendment warrant requirements apply); *see also Slaton*, 608 A.2d at 8 (where officers initially intend to search for evidence of a crime, they must obtain a warrant).

Our case law makes clear that where an officer or an agent initiates a search for the purpose of conducting a discretionary investigation into a report of a specific crime, the entire search is investigative in nature, not administrative, and traditional Fourth Amendment search and seizure principles should govern. The Majority creates an unworkable framework in which the administrative search exception swallows the warrant requirement when it applies two distinct legal doctrines to the same search and allows

officers to switch midstream from discretionary to administrative inspections. I am not questioning Trooper Rode's credibility here. Trooper Rode may have held a genuine belief that he merely followed a discretionary criminal investigation with what he believed to be an administrative search because it was more convenient to perform his duties in this manner. Nevertheless, I would not give his testimony binding legal effect since the initial purpose of his search (a discretionary criminal investigation) dictated the legal standard that applied under **Hudak** and **Slaton**.

Much of the deference given to Trooper Rode's testimony by the trial court and the Majority in according it dispositive legal effect rests on the idea that the latter part of the trooper's search was "unrelated" to his initial investigation. This is a less than compelling reason to accord Trooper Rode's testimony binding legal effect and, in addition, the distinction between "related" and "unrelated" searches carries no constitutional significance under our prior cases. In fact, the distinction is not supported by the record.

During both searches, Trooper Rode looked for irregularities in title documentation, so the searches were integrally related in this way - the latter simply being a significant expansion of the former. More specifically, Trooper Rode testified that he arrived at A to Z Auto to investigate a "complaint" wherein an unidentified person had not received title to his vehicle and that "it looked like part of the record was processed at A to Z." N.T., 9/28/2018, at 9; **id.** at 13 ("The complaint was he had not – the person did not yet receive

this title, and there [were] issues with how it was being processed."). As such,

Trooper Rode "wanted to see that specific record." *Id.* at 9. He then testified:

> Also, when I'm there, I make a standard policy [] that when – because, also, I'm supposed to be doing random audits and inspections of places. Also, when I'm there, I inspect the records as well of others just because I happen to be at the facility. And I can still handle [a] complaint for the person and still get an audit done at the same time.

*Id.* at 9-10. Thereafter, Trooper Rode explained:

> When Ms. Roman arrived, again, I identified myself, who I was. I told her I was here initially for the complaint regarding the 2012 GMC. And then I explained to her that, since I'm here, I just want to just take a look at the rest of your records and just to make sure that everything is in compliance and that the tag agency is doing what they're supposed to be doing.

*Id.* at 13-14. ("So I asked her to see -- I need to see the titles of all the

vehicles that -- of the cars that she had for sale.")

From that testimony, I make the following observations. First, while the

original "complaint" may not have resulted in one of the citations at issue, as

pointed out by the Majority,[1] Trooper Rode set out initially to investigate

potential criminal activity related to an individual complaint concerning the

perfection of title to an automobile. As such, the record is clear that Trooper

Rode responded initially to A to Z Auto to investigate a discretionary criminal

matter. Similar to **Slaton** and **Hudak**, Trooper Rode's intent, at the outset,

was to gather additional information regarding possible criminal conduct.

---

[1]  **See** Majority at *3 n.3.

When the initial consensual search concluded, however, Trooper Rode immediately initiated another search based upon his personal policy to perform administrative searches after conducting a criminal search. Within the context of the second search, Trooper Rode sought to review title records for all of the vehicles A to Z Auto held for sale. N.T., 9/28/2018, at 13-14. Hence, the record shows that the latter search was simply an expanded version of the initial criminal search, conducted under the pretext of an administrative review.

As **Slaton** and **Hudak** make clear, it is the purpose of the officer's initial search which determines whether the inspection has been conducted for investigative or administrative purposes. It is undisputed here that Trooper Rode responded to A to Z to investigate a possible crime. When he completed the initial phase of his search, he then expanded his inquiry into a general investigation of all the title records relating to the vehicles A to Z Auto held for sale under the guise of an administrative search.[2] Because Trooper Rode lacked a warrant to support that search, and since the Commonwealth failed to demonstrate any other exception to the warrant requirement, I would hold

_____

[2] I disagree with the Majority's suggestion that **Hudak** is factually distinguishable from this case. **See** Majority at 9. The Majority finds that "[u]nlike **Hudak**, this was not an investigation of suspected trafficking in stolen auto parts." **Id.** While it is true that stolen auto parts are not at issue in this matter, Trooper Rode went to A to Z Auto to investigate a specific criminal complaint concerning title records and only afterwards expanded his efforts to conduct a search under the guise of administrative function.

- 11 -

that Appellant was entitled to suppression. **See Petroll**, **Hudak**, **Slaton**,

**supra**.

I am also unable to agree with the Majority's conclusion that the

challenged procedure withstands scrutiny as a constitutionally valid

administrative search. Here, the Majority gives deference to the trial court's

credibility determination that Trooper Rode "testified that he was engaged in

a permitted routine administrative inspection to insure agent compliance with

Pennsylvania law on title transfers." Majority, at *9. I believe, however, the

Majority gives this credibility assessment too much weight in making its legal

determination.[3] As set forth above, Trooper Rode stated that he made it part

_____

[3]  Aside from Trooper Rode's testimony that he was engaged in a permitted, routine administrative search, the Commonwealth did not present any additional supporting evidence. **See Commonwealth v. Johnson**, 68 A.3d 930, 936 n.3 (Pa. Super. 2013) ("[I]t is the Commonwealth's burden to prove that the search and seizure is valid.")  There is no evidence that  the Pennsylvania Department of Transportation (PennDot), the regulatory agency tasked with overseeing compliance with Section 6308, gave Trooper Rode any guidance or input regarding the manner in which he conducts administrative searches.  Appellant testified that Trooper Rode did not claim his authority pursuant to the PennDot agreement or Section 6308.  N.T., 9/28/2018, at 64-65.  Furthermore, Trooper Rode testified that he did not review the PennDot agreement before arriving at A to Z Auto. **Id.** at 22.  The PennDot agreement, however, sets forth administrative sanctions for failure to maintain proper documents and/or for failing to comply with the Motor Vehicle Code. **See** PennDot Agreement, 10/14/2011, at 8-12.  Those sanctions include issuing written warnings, suspending operations temporarily, and/or terminating the agreement. **Id.**  However, in this case there is no evidence that PennDot took any subsequent administrative action against Appellant as provided by the agreement.  As such, the Commonwealth failed to show any evidence of agency involvement whatsoever.  Moreover, Trooper Rode issued Appellant the criminal citations a few hours after the search.  N.T., 9/28/2018, at 70.

of **his** standard policy to inspect all of the records of others when he happens to be at a facility investigating a specific matter. Just because he stated that it was his overall routine, does not make the procedure proper. In other words, while Trooper Rode may be truthful in saying he believed he conducted a routine and permitted administrative search pursuant to his own policy, his policy is inconsistent with the statutory scheme of Section 6308 which, as discussed below, must perform the two basic functions of a warrant.

As our Supreme Court noted in *Petroll*:

[A] search without a warrant of a closely regulated business will be reasonable if it satisfies the following three criteria:

First there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made....

Second, the warrantless inspection must be "necessary to further [the] regulatory scheme...."

Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law **and has a properly defined scope,**

---

There was no evidence that he consulted with PennDot or contemplated the agreement before doing so. If the search were administrative, there were administrative remedies available to impose. Accordingly, based upon this record, the search ultimately resulted in only the issuance of criminal citations, without any further administrative penalty. Because the search bore no indicia of administrative oversight or input, there was no evidence of any corrective administrative action taken by PennDot, and Trooper Rode issued only criminal citations, the Commonwealth failed to prove an administrative search rather than a criminal investigation.

- 13 -

**and it must limit the discretion of the inspecting officers**.

*Petroll*, 738 A.2d at 1000–1001, *citing* **New York v. Burger**, 482 U.S. 691, 702-703 (1987).

In this case, I would note the following. Trooper Rode's administrative search policy does not appear to be the type of randomized and routine search procedure contemplated by statute. In fact, mere convenience and Trooper Rode's criminal investigation priorities dictated the timing and occurrence of his administrative searches. After conducting a criminal investigative search, the trooper testified that he always undertakes an administrative search because he is already on site. Trooper Rode's personal administrative search policy of "convenience" is not the sort of regulation-driven, agency-guided policy that is consistent with the administrative search exception to the warrant requirement. As I stated above, the Commonwealth introduced no evidence of agency guidance or input in the effectuation of Trooper Rode's administrative search policy. The result here approves an agent's personal policy of performing warrantless "administrative" searches immediately after concluding criminal investigative searches based upon sheer convenience. Finally, Trooper Rode testified that he asked to see all of the title records at A to Z Auto immediately and without limitation. Trooper Rode's actions blurred the distinction between discretionary criminal searches, which require a warrant, and routine and randomized administrative searches that do not.

The search here was simply too broad, undefined, and placed no limits on the discretionary authority of enforcement officers.

For all of the aforementioned reasons, I would hold that the Commonwealth did not meet its burden in establishing a lawful seizure of the evidence even under the framework of an administrative search. Since Trooper Rode did not obtain a warrant and no exception to the warrant requirement was established, the search was illegal and all of the evidence seized was subject to suppression.

Moreover, I would reject the trial court's reliance upon PennDot's agreement with A to Z Auto in determining that the search was authorized or that Appellant consented to it. "[I]n a closely regulated industry where '[l]arge interests are at stake, and inspection is a crucial part of the regulatory scheme,' the validity of the search does not rest upon consent." ***Peterson v. Commonwealth, Pennsylvania State Horse Racing Com'n***, 449 A.2d 774, 778 (Pa. Cmwlth. 1982), *citing* ***United States v. Biswell***, 406 U.S. 311, 315 (1972). "In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." ***Biswell***, 406 U.S. at 315. Thus, the trial court's reliance on the PennDot agreement rather than the statutory language of Section 6308 was erroneous as a matter of law.

Regardless, upon review of the PennDot agreement, there is no language giving the police unfettered consent to conduct searches of A to Z Auto. The agreement permits, in relevant part:

26. [PennDot] reserves the right to make unannounced visits to audit, observe and inspect [Appellant's] service operations. Temporary registration plates and related documents shall be available for inspection, with or without notice, by authorized Commonwealth employees or designees, including the Pennsylvania State Police. Records required by the Department to be maintained by [Appellant] in carrying out the duties under this [a]greement shall be subject to periodic inspection by authorized representatives of the Commonwealth or its designated agents under the following conditions:

(1) Place – The inspection may be conducted at the issuing agent's established place of business.

(2) Time – The inspection may be conducted during regular and usual business hours.

(3) Scope – The inspection may be limited to examination of the records, plates, permit or other products designated by [PennDot], inventory which are subject to the record keeping requirement of this [a]greement and [PennDot] regulations or, based on the initial findings, may be expanded to include investigation of violations of the other terms of this [a]greement or [PennDot] regulations.

PennDot Agreement, 10/14/2011, at 7, ¶ 26.

The trial court determined that this agreement "obligated [Appellant] to maintain records related to title documents and have such documentation available for inspection by the Pennsylvania State Police." Trial Court Opinion, 2/27/2018, at 19. I agree with this assessment and note that maintaining documents and making them available for police inspection during normal business hours closely tracks the statutory language of Section 6308.

Additionally, paragraph 26 of the agreement provides for "periodic inspections," statutory language used when a business is closely regulated, "so that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Petroll*, 738 A.2d at 1001. Thus, I agree that Appellant was obligated to maintain records and have the documentation available for inspection. However, in order to demonstrate that an administrative search was undertaken, the Commonwealth was required to show that the inspection was conducted within the regulatory scheme of Section 6308 and not a mere pretext stemming from a criminal investigation. Because the Commonwealth did not meet that burden, as discussed at length above, consent to search based upon the PennDot agreement is unavailing.[4]

Finally, I would reject the trial court's conclusion that paragraph 26(3) of the PennDot agreement, as set forth above, permits "an expanded investigation[.]" Trial Court Opinion, 2/27/2018, at 18. Aside from quoting the agreement, the trial court has not cited any legal authority, and independent research has not revealed any, to suggest that an agency could enter into an agreement with a closely regulated business to garner blanket

---

[4] Moreover, I reiterate that A to Z Auto's agreement with PennDot does not change the criminal purpose of the initial search that subsequently broadened into a search for all irregularities pertaining to vehicular title.

consent for unfettered property searches at any time in the future. In any event, upon my review of the agreement at issue, Appellant simply did not consent to every police inspection at any given time.[5]

Ultimately, I would conclude that the trial court erred as a matter of law in denying suppression.[6] As such, I respectfully dissent.

_____

[5]  To allow agencies to require agreements that give them *carte blanche* to search any aspect of closely regulated business records would essentially eviscerate Section 6308.

Moreover, because the June 19, 2017 search of A to Z Auto constituted a discretionary criminal investigation carried out without a warrant under the pretext of an administrative search, any consent to the challenged search needed to be knowingly and voluntarily given. **See Commonwealth v. Krenzel**, 209 A.3d 1024, 1028 (Pa. Super. 2019). No such assessment was made by the trial court. Instead, the trial court relied upon a document executed in 2011 (six years before the challenged search) to conclude that Appellant consented to the June 19, 2017 search. The document, however, simply memorialized A to Z Auto's obligation to maintain certain records and make them available for inspection consistent with the regulatory purposes of Section 6308. In addition to our precedents that make clear that the context of administrative inspections of closely regulated businesses and the legality of a search does not depend on consent, I would note that the 2011 agreement would not constitute a knowing and voluntary consent to the instant investigative search.

[6] Because I believe that suppression was warranted, I decline to address Appellant's other allegations of trial court error.